## ST. PAUL FIRE & MARINE INSURANCE COMPANY v. CHARLES PRYSESKI

[No. 140, September Term, 1980.]

*Decided December 24, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Larry M. Waranch,* with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellant.

*Michael B. Mann,* with whom were *Donald L. Merriman* and *Merriman, Crowther & Merriman* on the brief, for appellee.

ELDRIDGE, J., delivered the opinion of the Court.

This declaratory judgment action concerns a liability insurer's duty to provide its insured with a defense in a tort suit brought against the insured.

During the time period relevant to this case, the Sun Life Insurance Company of America was a named insured in a liability insurance policy issued by the petitioner, St. Paul Fire & Marine Insurance Company. This policy, *inter alia,*

afforded coverage for "all sums which the Insured shall become legally obligated to pay as damages because of . . . bodily injury . . . to which this Insuring Agreement applies, caused by an occurrence . . . ." The coverage section went on to provide that St. Paul "shall have the . . . duty to defend any suit against the Insured on account of such bodily injury . . ., even if any of the allegations of the suit are groundless, false or fraudulent . . . ." The policy itself contained several exclusions and conditions, none of which is relevant in the present case. Thus, for purposes of this case, the policy broadly covered damages because of bodily injury "caused by an occurrence."

By a subsequent endorsement, which was in effect at the time of the events giving rise to this litigation, any employee of Sun Life "while acting within the scope of his duties" was added as a named insured. The same endorsement, among other things, expressly provided coverage for injury

> "arising out of one or more of the following offenses committed in the conduct of the Named Insured's business:
>
> Group A — False arrest, detention or imprisonment, or malicious prosecution;
>
> Group B — The publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities conducted by or on behalf of the Named Insured;
>
> Group C — Wrongful entry or eviction, or other invasion of the right of private occupancy . . . ."

The endorsement also provided that the words "bodily injury shall be deemed to include mental anguish, mental injury or

illness whether or not accompanied by physical injury or illness suffered by any person or persons." As far as the record in this case discloses, neither the main policy nor any endorsement provided a definition of the word "occurrence."

The respondent, Charles Pryseski, was at all relevant periods employed by Sun Life as a field manager and insurance agent. His duties included the collection of monthly premiums from policy holders of Sun Life.

In December 1977, Rosemary Grantland and her husband, John Grantland, filed a tort suit in the Superior Court of Baltimore City against Sun Life and Charles Pryseski. The declaration contained three counts. In the first count, entitled "Intentional Infliction of Emotional Distress," it was alleged that on the morning of December 22, 1976, Charles Pryseski, "in the course of his employment as agent for . . . Sun Life," came to the Grantlands' home for the purpose of collecting the monthly insurance premium which was due. It was further alleged that, after collecting the premium and receipting the Grantlands' payment book, Pryseski questioned Rosemary Grantland about her sex life, "began to make several sexual advances towards said Plaintiff, grabbing her buttocks and grabbing her shoulder with an attempt to grab her breast," and asked Rosemary Grantland to engage in sexual activities with him. It was asserted that Mrs. Grantland refused and insisted that Pryseski leave, which he did. The first count of the declaration recited that Pryseski's "outrageous and intolerable" conduct was committed "during the course of and while acting in the scope of his employment" with Sun Life, and that Sun Life, "after its investigation of the Plaintiffs' complaint, continued . . . Pryseski in its employ subsequent to the above-described intentional infliction of emotional distress, and did thereby ratify the acts of . . . Pryseski."

Another count of the Grantlands' declaration, entitled "Assault and Battery," incorporated the allegations of the first count. The assault and battery count went on to assert that Pryseski, "without any provocation, encouragement, justification or consent on the part of . . . Rosemary T. Grantland, did unlawfully, brutally, maliciously and

wantonly, with force and violence, assault and lay hold of . . . Rosemary T. Grantland, and did otherwise threaten and abuse her." This count similarly contained the allegation that Sun Life, after investigating the Grantlands' complaint, continued Pryseski in its employ and thus ratified Pryseski's acts. A third count of the declaration sought damages for loss of consortium.

St. Paul agreed to provide a defense for Sun Life in the tort action filed by the Grantlands and retained counsel to represent Sun Life. However, St. Paul refused Pryseski's request that he be provided with a defense. St. Paul, in a letter dated January 13, 1978, to the attorney retained by Pryseski, based its refusal on two grounds: (1) Pryseski was not acting within the scope of his employment; (2) the policy does not cover "willful acts in violation of the penal statute or ordinance."

On May 8, 1978, before the tort case was scheduled for trial, Pryseski instituted the present action against St. Paul in the Superior Court of Baltimore City, requesting a declaration that St. Paul was obligated to provide Pryseski with a defense in the pending tort suit and seeking reimbursement for the attorney fees incurred by Pryseski as a result of St. Paul's alleged breach of its duty to defend. On November 27, 1978, before either the tort suit or the present declaratory judgment action was called for trial, St. Paul settled the tort suit for $1,000.00. The release signed by the Grantlands expressly released Pryseski, and an order of satisfaction was filed in the tort suit.

Thereafter, at the trial of the instant case, Pryseski testified that he had been an employee of Sun Life for thirty-four years, that he was presently an employee, and that his duties included visiting the homes of insureds each month to collect the premiums and receipt the premium books. He acknowledged visiting the Grantlands' home on December 22, 1976, collecting the premium due and receipting the book. However, Pryseski specifically denied engaging in any of the other conduct alleged in the Grantlands' tort suit. After the trial, the court declared that

under the provisions of the policy, St. Paul had been required to provide Pryseski with a defense in the tort suit. The court also entered a money judgment in favor of Pryseski for $3,081.65.

St. Paul appealed to the Court of Special Appeals, arguing that the alleged tortious conduct of Pryseski was not an "occurrence" within the meaning of the coverage clause of the policy. The Court of Special Appeals, however, affirmed in an unreported opinion. The intermediate appellate court stated that "the rule for determining whether an insurer has a duty to defend its insured" was set forth in *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 407-408, 347 A.2d 842 (1975), and it quoted from the *Brohawn* case as follows:

> "The obligation of an insurer to defend its insured under a contract provision such as here involved is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend. . . . Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy."

The Court of Special Appeals also relied upon *U. S. F. & G. v. Nat. Pav. Co.,* 228 Md. 40, 178 A.2d 872 (1962), to the effect that, even though the declaration in the tort case "did not allege every fact necessary to establish . . . coverage, . . . there was enough to indicate a *potentiality* that, under the allegations actually made, the injury in question was caused by some act or omission covered by the terms of the contract." 228 Md. at 54-55, emphasis supplied. The Court of Special Appeals then concluded in the case at bar:

> "Applying the above rule to the case before us, we believe that while coverage cannot be established clearly from the facts alleged in the Grantlands' suit, the allegations were sufficient to indicate a possibility that the claim in question was covered

by the terms of the policy. The declaration alleged that the defendant, Pryseski, was acting 'in the course of his employment as an agent for the defendant, Sun Life . . . .' That allegation was sufficient, under the policy provisions above quoted, to raise a potentiality that coverage existed if Defendant Pryseski were liable for the injuries alleged by the Grantlands. Under the circumstances of this case, the appellant, St. Paul, had a duty to defend Mr. Pryseski."

St. Paul filed a petition for a writ of certiorari, contending that the holding of the Court of Special Appeals in this case "expands" an insurer's duty to defend beyond that delineated in *Brohawn v. Transamerica Ins. Co., supra,* and other cases in this Court. St. Paul further argued that the Court of Special Appeals should have decided the meaning of "occurrence" in the coverage clause of the policy. We granted the petition, and, for the reasons set forth below, we shall vacate the decision of the Court of Special Appeals and remand the case to the trial court for further proceedings.

## I

In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit. At times these two questions involve separate and distinct matters, and at other times they are intertwined, perhaps involving an identical issue.

The "rule" applied by the Court of Special Appeals in this case, namely that the insurer has a duty to defend if the allegations of the tort suit raise a "potentiality" that

coverage exists, is generally applicable only to the second question set forth above. It may, however, be applicable to an issue raised under the first question set forth above if that issue must also be resolved in the underlying tort suit.

Normally, however, when the question of coverage or defenses under the language or requirements of the insurance policy is separate and distinct from the issues involved in the tort suit, the "potentiality rule" relied on by the court below has no application. Instead, in a declaratory judgment action like the instant one, presenting an independent coverage issue under the terms of the policy, it is the function of the court to interpret the policy and decide whether or not there is coverage. If such a coverage issue depends upon language of the policy which is ambiguous, the court in the declaratory judgment action nevertheless must resolve that ambiguity in favor of the insured before it can conclude that the insurer has or had an obligation to provide a tort defense. This is the clear teaching of cases such as *Truck Ins. Exch. v. Marks Rentals,* 288 Md. 428, 418 A.2d 1187 (1980); *Bankers & Ship. Ins. v. Electro Enter.,* 287 Md. 641, 415 A.2d 278 (1980); *Brohawn v. Transamerica Ins. Co., supra; U. S. F. & G. v. Nat. Pav. Co., supra.*

Thus in *Brohawn v. Transamerica Ins. Co., supra,* upon which the Court of Special Appeals relied, this Court clearly distinguished an independent question of policy coverage from the question of whether the tort suit allegations set forth a claim potentially covered by the policy. We there stated (276 Md. at 405):

> "A declaratory judgment action prior to the trial of a tort action against the insured may under some circumstances be a valuable means of resolving questions of policy coverage where those questions are independent and separable from the claims asserted in a pending suit by an injured third party. An early resolution could avoid unnecessary expense and delay to the parties. Thus, where an insurance company claims lack of coverage because of the insured's failure to comply with contract pro-

visions such as the cooperation or notification clause, or failure to pay premiums, a declaratory judgment would ordinarily be appropriate and should be granted. . . .

"But here, Transamerica seeks to have resolved in a declaratory judgment proceeding questions which would be fully decided in pending tort actions."

In *U. S. F. & G. v. Nat. Pav. Co., supra,* involving a suit by an insured against its insurer to recover the damages resulting from the latter's denial of coverage in a tort action which the insured ultimately settled, this Court initially construed the language of the insurance policy to determine the scope of the coverage. 228 Md. at 47-54. Then, after ascertaining the scope of the coverage under the policy's language, the Court turned to the allegations of the tort suit and decided that they were sufficient "to indicate a potentiality" that the injury was caused by an act covered by the policy. 228 Md. at 54-55.

A case very similar to the present one is *Truck Ins. Exch. v. Marks Rentals, supra.* There, the insured operated a franchised car rental business, and the liability insurance policy covered automobiles which the insured "may rent to others, or operate under his . . . rent-a-car franchise." 288 Md. at 431. An employee of the insured, driving her own automobile, was involved in an accident which injured someone else. The injured party brought a tort suit against the employee in which the insured employer was later added as a defendant. It was alleged in the tort suit that the employee was acting in the scope of her employment. After the insurance company refused to provide the insured employer with a defense in the tort case, the insured brought a declaratory judgment action against the insurer. As in the case at bar, there were two issues relating to coverage: (1) whether the employee was acting in the scope of her employment, and (2) if she was so acting, whether her automobile was being "operate[d]" under the car rental franchise within the meaning of the policy's coverage clause. This Court assumed

for purposes of the declaratory judgment action that the employee was acting in the scope of her employment, pointing out that this issue "is one which must be resolved in the underlying tort suit," 288 Md., *id.* at 430, n. 1. We then proceeded to construe the terms of the policy covering vehicles which the insured "operate[s] under his . . . rent-a-car franchise," *id.* at 431-436. We found that the policy language was ambiguous, and that there had been introduced at trial no admissible extrinsic evidence disclosing either the parties' intent or any peculiar trade usage of the words. Consequently, applying the principle of construction that an ambiguity in a contract ordinarily will be resolved against the party responsible for drafting the instrument, we held that the vehicle was within the policy's coverage clause. *Id.* at 435.

As previously indicated, the instant cause involves the same situation as *Truck Ins. Exch. v. Marks Rentals.* In light of the allegations of the tort suit concerning scope of employment and ratification, the Court of Special Appeals in this case correctly held that the tort suit determined the scope of employment issue. On the other hand, the Court of Special Appeals erred in not construing the coverage language of the policy. Like the policy language in *Truck Ins. Exch.,* the meaning of the coverage terms in the Sun Life policy was an issue to be resolved in the present litigation.

## II.

St. Paul concedes that if Pryseski's alleged tortious conduct amounted to an "occurrence" as that term is used in the original policy, there would be coverage even though the conduct was not within one of the three groups of covered "offenses" set forth in the endorsement, *i.e.,* false imprisonment, malicious prosecution, libel or slander, etc. St. Paul thus states in its brief that "coverage is afforded for liability because of bodily injury caused either by an 'occurrence' or by any one or more of the three classes of intentional offenses expressly described." (Petitioner's Brief, p. 7). Since we

agree with St. Paul that Pryseski's alleged conduct did not fall within the specific groups of offenses delineated by the endorsement, the critical issue is whether the alleged activity was an "occurrence."

Despite the fact that the word "occurrence" was not defined in the insurance policy or any of the endorsements filed in this case, St. Paul argues that cases dealing with the term in insurance policies have "consistently held that, in the absence of a contrary policy definition, an 'occurrence' is an *unintentional* act or happening, synonymous to an accident." (Petitioner's Brief, p. 8). St. Paul cites the following authorities in support of this contention: *Grange Mutual Casualty Company v. Thomas,* 301 S.2d 158 (Fla.App. 1974); *Lititz Mut. Ins. Co. v. Branch,* 561 S.W.2d 371 (Mo.App. 1977); *Marine Midland Ser. v. Samuel Kosoff, Etc.,* 60 A.D.2d 767, 400 N.Y.S.2d 959 (1977); *Argonaut Southwest Insurance Company v. Maupin,* 500 S.W.2d 633 (Tex. 1973); *Truck Insurance Exchange v. Rohde,* 49 Wash.2d 465, 303 P.2d 659 (1956); 1 Long, *The Law Of Liability Insurance,* § 1.25 (1966). Because Pryseski's alleged tortious conduct was intentional, St. Paul insists that it could not amount to an "occurrence" under the definition established by the above-cited authorities.

However, none of the authorities relied upon supports St. Paul's argument. The only one of the cited cases actually involving the issue of whether an intentional tort constituted an "occurrence" within the meaning of the insurance policy, is *Argonaut Southwest Insurance Company v. Maupin, supra,* and in that case the policy explicitly defined the word "occurrence" as either an "accident" or a "condition" causing physical injury to property "which was not intended." 500 S.W.2d at 634, n. 1. The remaining cases neither involved nor even discussed the question of whether the term "occurrence" by itself was limited to unintentional acts. Moreover, in the treatise relied upon, the author points out that the term "occurrence" is broader than "accident," and that underwriters began to use "occurrence" in policies for the purpose of broadening coverage. 1 Long, *The Law Of Liability Insurance, supra,* § 1.25, pp. 1-68 through 1-73.

*See also* § 1.23. In addition, the author discusses several different definitions of "occurrence" used in policies (§ 1.25), points out that decisions defining the term are not consistent *(id.* at p. 1-71), and suggests that some intentional torts may be covered by certain definitions of "occurrence" *(id.* at p. 1-72).

The meaning of the word "occurrence" is certainly broad enough to cover an event due to intentional conduct. One dictionary defines "occurrence" as "1. the action or fact of occurring. 2. something that happens; event; incident." *The Random House Dictionary Of The English Language,* p. 996 (Unabridged Ed. 1967). After pointing to an obsolete meaning, the first definition set forth in *Webster's* is "[a]ppearance or happening; as, the *occurrence* of a fire." *Webster's New International Dictionary,* p. 1684 (2d Ed., Unabridged, 1934). The next meaning listed in *Webster's,* however, might lend a modicum of support to St. Paul's position: "Any incident or event, esp. one that happens without being designed or expected; as, an unusual *occurrence." Ibid.*

In *Truck Ins. Exch. v. Marks Rentals, supra,* 288 Md. at 433, with regard to language in the coverage clause of a liability insurance policy, we stated:

> "Although language which is merely general in nature or imprecisely defined is not necessarily ambiguous, . . . an ambiguity does arise if, to a reasonably prudent layman, the language used is susceptible of more than one meaning."

In our view, the word "occurrence" is reasonably susceptible of more than one meaning and, therefore, is ambiguous. Consequently, in such situation, extrinsic evidence is admissible at trial to show the parties' intent and to show whether the term does or does not have a particular trade usage. And if the ambiguity is not resolved by extrinsic evidence, rules of construction are applicable. *See* the discussion in *Truck Ins. Exch. v. Marks Rentals, supra,* 288 Md. at 433-436, and cases there cited.

In the instant case, neither side presented extrinsic evi-

dence bearing upon the meaning of "occurrence." Furthermore, the record indicates that the insurance policy was drafted and issued by St. Paul. Under these circumstances, we would normally apply the "principle of contract construction that where one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against that party." *Truck Ins. Exch. v. Marks Rentals, supra,* 288 Md. at 435, and cases there cited. The case before us, however, presents an additional factor. St. Paul in its brief in this Court makes the following representation (petitioner's brief, p. 7, n. 1):

> "After this court granted the Appellant's Petition For A Writ Of Certiorari in this case, Appellant's attorney learned that the St. Paul policy in issue did contain a definition of the word 'occurrence.' This definition was contained in the policy 'jacket' which was not included with that portion of the policy which St. Paul forwarded to its counsel upon its counsel's request for a certified copy of the policy in question. Likewise, the policy jacket was not included with that portion of the policy which the Appellee appended to his Petition For A Declaratory Judgment in this case. At trial, the policy jacket was not introduced into evidence and thus is not part of the record in this case."

In light of this circumstance, we shall in the interests of justice invoke Maryland Rule 871 a and remand the case to the trial court for further proceedings.[1]

---

1. Rule 871 a provides as follows:

   "a. *For Further Proceedings.*

   If it shall appear to this Court that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment from which the appeal was taken, or that the purposes of justice will be advanced by permitting further proceedings in the cause, either through amendment of the pleadings, introduction of additional evidence, making of additional parties, or otherwise, then this Court, instead of entering a final order affirming, reversing or modifying the judgment from which the appeal was taken, may order the case to be remanded to the appro-

Upon remand, St. Paul may offer the definition of "occurrence" said to have been found in the "policy jacket." The authenticity of this document, whether it was actually part of the policy issued to Sun Life under which Pryseski was a named insured, and the probative value of the "definition," are matters for the trial court in the first instance. Also upon remand both sides shall be entitled to introduce any additional admissible extrinsic evidence relevant to the meaning of "occurrence" in the policy. If the trial court is unable to resolve the ambiguity upon the evidence introduced, if any, then the ambiguity should be resolved against St. Paul as the party preparing the contract.

> *Judgment of the Court of Special Appeals vacated, and case remanded to that court with instructions to remand the case to the Superior Court of Baltimore City for further proceedings consistent with this opinion and Rule 871.*
>
> *Costs to abide final result.*

---

priate court. Upon remand to the appropriate court, such further proceedings shall be had by amendment of the pleadings, introduction of additional evidence, making of additional parties, or otherwise, as may be necessary for determining the action upon its merits as if no appeal had been taken and the judgment from which the appeal was taken had not been entered; provided, however, the order entered by this Court in remanding said case, and the opinion of this Court on which said order is passed, shall be conclusive as to the points finally decided thereby. In such an order remanding a case, this Court will express the purpose for so remanding and in its opinion filed with said order will determine all questions which may have been properly presented."