**SOUTHERN MARYLAND AGRICULTURAL ASSOCIATION, INC. (A Maryland Corporation) and Southern Maryland Agricultural Fair Association of Prince George's County (A Maryland Corporation)**

v.

**The BITUMINOUS CASUALTY CORP. and Fireman's Fund Insurance Company.**

**Civ. A. No. M–81–1632.**

United States District Court, D. Maryland.

May 7, 1982.

---

William R. Dorsey, III, E. Charles Dann, Jr., and Semmes, Bowen & Semmes, Baltimore, Md., for plaintiffs.

Robert E. Cahill, Ira L. Oring and Melnicove, Kaufman, Weiner & Smouse, Baltimore, Md., for defendant Bituminous Cas. Corp.

Donald L. Merriman and Merriman, Crowther & Merriman, Baltimore, Md., for defendant Fireman's Fund Ins. Co.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

The plaintiffs, the Southern Maryland Agricultural Association, Inc. (Bowie) and the Southern Maryland Agricultural Fair Association of Prince George's County (Marlboro), brought this declaratory judgment action against the Bituminous Casualty Corporation (Bituminous) and the Fire-

man's Fund Insurance Company (Fireman's Fund), seeking a declaration that, under their respective insurance policies, the defendants are: (1) obligated to defend the plaintiffs in a tort suit now pending in state court; (2) obligated to pay the legal fees and expenses so far incurred by the plaintiffs in connection with the defense of that suit; and (3) obligated to allow the plaintiffs to select their own independent counsel to defend that suit, whose fees and expenses are to be paid by the defendants.

This case is presently before the court on the plaintiffs' motion for partial summary judgment.[1] The motion does not seek to establish the amount of fees and expenses, if any, the defendants are obligated to pay the plaintiffs. The issues have been briefed by the parties, and the court heard argument from counsel on April 23, 1982.

### I. Overview

In October of 1979, William Bender and other former employees of the plaintiffs filed suit against Bowie, Marlboro, and other individuals and entities in the Superior Court of Baltimore City. That lawsuit (the Bender suit) was removed by Bowie and Marlboro to this Court, but was subsequently remanded to the Superior Court where it is presently pending.

The original declaration in the Bender suit contained seven counts seeking damages for the plaintiffs' allegedly improper charges of theft against Bender and his co-employees, which resulted in their indictment (subsequently nolle prosequi) and termination from employment.

The original declaration[2] filed on October 18, 1979, contained seven counts. The specific causes of action were preceded by "factual allegations" common to all of the counts. In brief, the Bender claimants alleged that they were members of a union having a collective bargaining agreement with Bowie and Marlboro; that they had worked as admission ticket sellers; that during the Bowie fall meet of 1976, Bowie,

---

1. Paper No. 13.

2. Paper No. 1, Ex. 3.

Marlboro and others[3] investigated the claimants for alleged theft; that the investigation was superficial and without merit but led to the claimants' indictment and re-indictment in 1976 and 1977 for various theft-type offenses; and that after the charges were dismissed against Bender the charges against the remaining claimants were *nolle prosequi.*

Bowie and Marlboro removed the Bender suit to this Court on November 16, 1979, and filed a motion to dismiss. Judge Jones dismissed, without leave to amend, two counts of the original declaration. An amended and second amended declaration were filed in the Bender suit, the latter after remand to state court on May 4, 1981. In state court, a demurrer was sustained, without leave to amend, as to count seven, leaving for trial counts one, three, and six of the second amended declaration.[4]

Count one seeks to recover on a theory of malicious interference with contract, arising out of the allegation that Bowie and Marlboro caused the criminal indictments to be issued against the Bender claimants so they would be terminated from their employment with other racetracks. Count three seeks to recover against Bowie, Marlboro and others under a theory of malicious prosecution. In count six, the claimants contend that Bowie, Marlboro and others caused the issuance of the criminal indictments with the intention of inflicting emotional distress.

Bowie and Marlboro retained the law firm of Semmes, Bowen and Semmes (Semmes) to represent them in the Bender suit. Semmes has kept Bituminous and Fireman's Fund apprised of the developments in that litigation. It is undisputed that, despite repeated requests from Bowie and Marlboro, both Bituminous and Fireman's Fund have refused to assume the defense of the Bender suit.[5]

Bowie and Marlboro are named insureds under the terms of insurance policies issued by Bituminous[6] and Fireman's Fund.[7] The Bituminous policy covered the period January 1, 1976 to January 1, 1977. The Fireman's Fund policy covered the period January 1, 1977 to January 1, 1978.

The plaintiffs contend that under the terms of the respective insurance policies, the defendants are required to defend the Bender suit. The plaintiffs also contend that because the defendants have indicated that not all of the claims in the Bender suit are within the policy coverage, there is a conflict of interest and the plaintiffs are entitled to select independent counsel at the defendants' expense.

## II. *Discussion*

The legal principles governing this sort of declaratory action are relatively well settled, and were recently reviewed in *St. Paul Fire & Marine Insurance Co. v. Pryseski*, 292 Md. 187, 438 A.2d 282 (1981). Writing for the Court of Appeals, Judge Eldridge stated:

"In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit.

---

3. The Office of the State's Attorney for Prince George's County, Maryland, was alleged to have been involved in this investigation.

4. The so-called common factual allegations were repeated by the Bender claimants in all three declarations.

5. Both defendants have admitted this fact with the qualification that they would have "participated" in the litigation but for Semmes' refusal to relinquish control over the defense. Bitumi-

nous Admissions, Paper No. 11 at ¶ 3; Fireman's Fund Admissions, Paper No. 10 at ¶¶ 17–19. Neither defendant has asserted, however, that it would have undertaken a complete defense of the Bender suit if Semmes had been willing to step aside.

6. Paper No. 1, Ex. 1.

7. Paper No. 1, Ex. 2.

At times these two questions involve separate and distinct matters, and at other times they are intertwined, perhaps involving an identical issue."

292 Md. at 193, 438 A.2d 282.

■ Thus, the court must first attempt to determine what sorts of claims are covered under the policy. If the question of what sorts of claims are covered is the same as the issue to be tried in the underlying tort suit, the court proceeds to the second inquiry. If not, the court must construe the policy to determine coverage.

■ If the policy language is unambiguous, the court determines as a matter of law the scope of the policy coverage. If, on the other hand, the language is ambiguous, the court must consider extrinsic evidence of the parties' intent and trade usage. Should the ambiguity not be resolved by resort to such extrinsic evidence, the policy is construed against the insurer, as the party which drafted the agreement, and in favor of coverage for the insured. *St. Paul Fire & Marine Insurance Co. v. Pryseski*, 292 Md. at 194–96, 438 A.2d 282; *Truck Insurance Exchange v. Marks Rentals, Inc.*, 288 Md. 428, 433–36, 418 A.2d 1187 (1980).

If the court concludes that certain "claims" are covered under the policy language, or cannot so decide because that is the issue to be tried in the underlying action, the court then applies the rules of *Brohawn v. Transamerica Insurance Co.*, 276 Md. 396, 347 A.2d 842 (1975). Judge Eldridge for the Court of Appeals stated the first rule as follows:

"The obligation of an insurer to defend its insured under a contract provision such as here involved is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend. *Journal Pub. Co. v. General Cas. Co.*, 210 F.2d 202, 207, (9th Cir. 1954); *Boyle v. National Cas. Co.*, 84 A.2d 614, 615–616, (D.C.Mun.App.1951); *Travelers Insurance Co. v. Newsom*, 352

S.W.2d 888, 892 (Tex.Civ.App.1961); 7A Appelman, *Insurance Law and Practice* § 4682; Annot., 50 A.L.R.2d 458. Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy. *U.S.F.&G. v. Nat. Pav. Co.*, 228 Md. 40, 54, 178 A.2d 872 (1962)."

276 Md. at 407–08, 347 A.2d 842 (emphasis in original).

■ Should any of the claims in the underlying suit be within the policy coverage, the insurer, at least initially, is obligated to defend against all claims not specifically excluded by the policy. This court so held in *Steyer v. Westvaco Corp.*, 450 F.Supp. 384 (D.Md.1978), stating:

"Once it is determined that the insurance policy creates a duty to defend against claims made within the policy's coverage and it is further determined that the complaint alleges a cause of action within the policy's coverage, the company is obligated to defend the suit, notwithstanding alternative allegations outside the policy's coverage, until such time, if ever, that the claims have been limited to ones outside the policy coverage. *See, e.g., Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975) (implicit); *[Employers Mutual Liability Ins. Co. v.] Hendrix*, [4th Cir.] 199 F.2d [53] at 56–57; *Bundy Tubing Co. v. Royal Indemnity Co.*, 298 F.2d 151, 154 (6th Cir. 1962)."

450 F.Supp. at 389.[8] *See Minnick's, Inc. v. Reliance Insurance Co.*, 47 Md.App. 329, 333–34, 422 A.2d 1028 (1980) (quoting *Steyer* with approval).

■ *Brohawn* also established the rule that an insurer is not relieved of its duty to defend even if so doing would place the insurer in a situation of conflict of interest with the insured. For example, if under one theory of recovery (i.e. negligence)

---

8. *See, e.g., Donnelly v. Transportation Insurance Co.*, 589 F.2d 761, 765 (4th Cir. 1978); *Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 537 (8th Cir. 1970); *Lee v. Aetna Casualty & Surety Co.*, 178 F.2d 750, 752–53 (2d Cir. 1949).

there is policy coverage but under an alternate theory (i.e. intentional tort) there is not. In this type of a situation *Brohawn* requires that the insured:

"be informed of the nature of the conflict and given the right either to accept an independent attorney selected by the insurer or to select an attorney himself to conduct his defense. If the insured elects to choose his own attorney, the insurer must assume the reasonable costs of the defense provided."

276 Md. at 414–15, 347 A.2d 842.[9]

### A. The Bituminous Policy

The plaintiffs' claims against Bituminous are founded upon two provisions of the Bituminous policy. The coverage portion of the "Comprehensive General Liability" section states, in pertinent part, that the insurer will:

"[P]ay on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as damages because of

A. *Bodily injury,* or

B. *Property damage*

to which this insurance applies, caused by an *occurrence* and the Company shall have the right and duty to defend any suit against the *insured* seeking damages on account of such *bodily injury* or *property damage,* even if any of the allegations of this suit are groundless, false or fraudulent." [10]

An "occurrence" is defined by the policy as:

"an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." [11]

The Court of Special Appeals of Maryland has twice construed an "occurrence" clause identical to that contained in the Bituminous policy. *Ed. Winkler & Son, Inc.*

*v. Ohio Casualty Insurance Co.,* 51 Md. App. 190, 441 A.2d 1129 (1982); *American Home Assurance Co. v. Osbourn,* 47 Md. App. 73, 422 A.2d 8 (1980), *cert. denied,* 289 Md. 739 (1981).

■ In both of those cases the Court of Special Appeals held there to be two aspects of an "occurrence." First, an occurrence could be a single event "accident." Second, an occurrence could be a "continuous or repeated exposure to conditions" in the nature of an "accident." In either case, such could neither have been expected nor intended when viewed from the insured's vantage point.

■ It is apparent that none of the claims in the Bender declarations can reasonably be said to have been due to an "accident" as that word has been construed in this context by the Court of Special Appeals. *See, e.g., Ed. Winkler & Son, Inc. v. Ohio Casualty Insurance Co.,* 441 A.2d at 1132; *American Home Assurance Co. v. Osbourn,* 47 Md.App. at 80–81, 422 A.2d 8. Further, even if the events and injuries alleged in the Bender declarations arose out of a "continuous or repeated exposure to conditions," they cannot be said to have been "unexpected" by the plaintiffs and were not "accidental" in nature. *See generally* 7A Appleman, *Insurance Law and Practice* § 4492 (Berdal ed. 1979). In short, even assuming that the Bender declarations allege that the claimants suffered "bodily injury" or "property damage" within the meaning of the Bituminous policy, the plaintiffs' motion must be denied to the extent that it is based on the "General Comprehensive Liability" section of the policy.

The second aspect of the Bituminous policy relied on by the plaintiffs is an endorsement entitled "Personal Injury and Advertising Injury Liability Coverage." Under that provision, Bituminous agreed to:

---

**9.** *See, e.g., Steyer v. Westvaco Corp.,* 450 F.Supp. at 391; *Nationwide Mutual Insurance Co. v. Webb,* 291 Md. 721, 741, 436 A.2d 465 (1981). *See also United States Fidelity & Guaranty Co. v. Louis A. Roser Co., Inc.,* 585 F.2d 932, 939 & n.6 (8th Cir. 1978) and cases cited therein.

**10.** Paper No. 1, Ex. 1 at 6.

**11.** Paper No. 1, Ex. 1 at 2.

"[P]ay on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as *damages* because of injury sustained by any person or organization and arising out of one or more of the following offenses committed in the conduct of the *named insured's* business:

Group A—False arrest, detention or imprisonment, or malicious prosecution.

Group B—The publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities conducted by or on behalf of the *named insured* :

Group C—Wrongful entry or eviction or other invasion of the right of private occupancy; herein called *personal injury*; or,

Group D—Libel, slander, defamation, violation of right of privacy, piracy, unfair competition or infringement of copyright, title or slogan, arising out of the named insured's advertising activities; herein called 'advertising injury':

If such offense is committed during the policy period within the United States of America, its territories or possessions, or Canada, and the Company shall have the right and duty to defend any suit against the *insured* seeking *damages* on account of *personal injury* or such *advertising injury,* even if any of the allegations of the suit are groundless, false or fraudulent." [12]

In opposing the plaintiffs' motion, Bituminous not only contends that the claims in the Bender suit are not "occurrences" within the meaning of the main policy but also asserts as follows:

"The other portion of the Bituminous policy relied upon by the Plaintiffs is the Personal Injury and Advertising Injury Liability Coverage endorsement .... By that endorsement, Bituminous agreed to pay for damages sustained as a result of certain enumerated *offenses*.... Count 3 of the Amended Declaration, seeking recovery for malicious prosecution, clearly falls within the ambits of the endorsement, as malicious prosecution is a named "offense". (sic) The applicability of the endorsement to the other counts of the Bender suit ... is an entirely different matter." [13]

Such a statement constitutes an admission [14] that at least one of the claims in the Bender suit is the type of claim for which coverage is provided under the above-quoted endorsement. *See St. Paul Fire & Marine Insurance Co. v. Pryseski,* 292 Md. 193–194, 438 A.2d 282.

Despite such apparent coverage, Bituminous asserts that the plaintiffs' motion should be denied because the court "does not have before it sufficient facts to make a determination when the acts giving rise to coverage under the Bituminous policy, as opposed to the Fireman's Fund policy, occurred." [15] In other words, Bituminous contends that the declarations in the Bender suit are not sufficiently specific, as to when the underlying events took place, to permit a determination that an "offense" was committed during the policy period.

This contention appears to involve both of the two inquiries identified by Judge Eldridge in *Pryseski.* As to the threshold coverage question, it is plain that there would be no coverage under a policy, and thus no duty to defend, if the underlying tort claim did not arise during or otherwise fall within the policy period. Nevertheless, when, if ever, the acts or events giving rise to a type of claim within the policy coverage took place would seem to be governed by the *Brohawn* "potentiality" rule.

---

12. Paper No. 1, Ex. 1 at 26.

13. Paper No. 15 at 6.

14. At the hearing of April 23, 1982, counsel for Bituminous made no arguments to the contrary. *See Mourning v. Family Pub. Service,* *Inc.,* 411 U.S. 356, 362 n.16, 93 S.Ct. 1652, 1657 n.16, 36 L.Ed.2d 318 (1973); 6 *Moore's Federal Practice* ¶ 56.11[6] at 56–287 & n.11 (2d ed. 1982).

15. Paper No. 15 at 3.

Before addressing this issue, however, there is a legal question that first must be answered: when, for insurance coverage purposes, is the offense of malicious prosecution committed? The parties have not referred to, and the court's own research has not disclosed, any Maryland cases addressing this question. Consequently, this court must predict how the Court of Appeals of Maryland would rule if presented with the question. *E.g., Nature Conservancy v. Machipongo Club, Inc.*, 579 F.2d 873, 875 (4th Cir.), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978).

The few reported decisions from other jurisdictions have yielded two outcomes. Two courts have held that because a cause of action for malicious prosecution does not mature until a favorable determination in the underlying action, that date is used to determine whether there is coverage under an insurance policy. *Roess v. St. Paul Fire & Marine Insurance Co.*, 383 F.Supp. 1231, 1233–35 (M.D.Fla.1974); *Security Mutual Casualty Co. v. Harbor Insurance Co.*, 65 Ill.App.3d 198, 21 Ill.Dec. 707, 712–13, 382 N.E.2d 1, 5–6 (App.Ct.1978), *rev'd on other grounds*, 77 Ill.2d 446, 34 Ill.Dec. 167, 397 N.E.2d 839 (Ill.1979).

Two other courts have held that the crucial date, for insurance purposes, is when the alleged tortfeasor invoked the legal machinery of the state. *S. Freedman & Sons, Inc. v. Hartford Fire Insurance Co.*, 396 A.2d 195, 198–200 (D.C.1978); *Muller Fuel Oil Co. v. Insurance Co. of North America*, 95 N.J.Super. 564, 232 A.2d 168, 174–76 (Super.Ct.App.Div.1967).

■ This court is persuaded by the reasoning of Judge Kelly in the *Freedman* case that the "offense" of malicious prosecution is committed, for insurance coverage purposes, when the alleged tortfeasor takes action resulting in the application of the State's criminal process to the claimant.[16] Unlike the contract at issue in *Roess*, 383

F.Supp. at 1233, which involved coverage for an "operative occurrence," the contract in *Freedman* "promise[d] coverage 'if such offense is committed . . . during the policy period.'" 396 A.2d at 199. The same "offense" language is used in the Bituminous endorsement.

Judge Kelly advanced several reasons why the "offense" of malicious prosecution should be deemed committed for insurance coverage purposes when the alleged tortfeasor invokes the State's legal machinery. First, she said the fact that the statute of limitations for a malicious prosecution claim would not begin to run until a termination favorable to the claimant is not dispositive of the issue because:

> "that rule is based on policies of protecting notice and securing ultimate peace between adversaries without unjustly barring claims. This is the basis for the general rule that the statute of limitations begins to run only 'from the time the right to maintain the action accrues.' D.C.Code 1973, § 12–301, *i.e.*, from the time that *all* the elements of a cause of action exist."

396 A.2d at 198. *See, e.g., Goldstein v. Potomac Electric Power Co.*, 285 Md. 673, 684–85, 404 A.2d 1064 (1979); *James v. Weisheit*, 279 Md. 41, 44, 367 A.2d 482 (1977); *Washington, Baltimore & Annapolis R.R. Co. v. Moss*, 130 Md. 198, 205, 100 A. 86 (1917); *Md. Cts. & Jud. Proc. Code Ann.* § 5–101 (1980 Rep. Vol.). As Judge Kelly noted, the policies underlying periods of limitations and their operation:

> "need not determine the crucial date for third-party insurance liability. On that issue, our underlying policy must be to give effect to the intent of the parties as evidenced by the contract to which they have agreed. Appleman on Insurance §§ 7381, 7384; Couch on Insurance 2d § 15:1; 44 C.J.S. *Insurance* §§ 289, 291."

---

**16.** The elements of a malicious prosecution claim are the same in both Maryland and the District of Columbia. *Compare Exxon Corp. v. Kelly*, 281 Md. 689, 693, 381 A.2d 1146 (1978) and *Safeway Store's, Inc. v. Barrack*, 210 Md.

168, 173, 122 A.2d 457 (1956) *with Weisman v. Middleton*, 390 A.2d 996, 1002 (D.C.1978) *and Ammerman v. Newman*, 384 A.2d 637, 639 (D.C.1978).

396 A.2d at 198. *See, e.g., National Grange Mutual Insurance Co. v. Pinkney*, 284 Md. 694, 705–06, 399 A.2d 877 (1979); *United Life & Accident Insurance Co. v. Prostic*, 169 Md. 535, 537, 182 A. 421 (1936); *Frontier Mortgage Corp. v. Heft*, 146 Md. 1, 12–13, 125 A. 772 (1924).

Second, the fact that a claimant cannot maintain successfully a malicious prosecution action until a favorable termination is not determinative of a question of insurance coverage. In *Freedman*, as here, the insurance policy at issue

> "speaks, not of the date when an action could be brought, but of the time that the offense occurred."

> \*    \*    \*    \*    \*    \*

> "Clearly, a third-party's failure to secure a favorable termination before bringing suit for malicious prosecution would not void the obligation of an insurance company to defend against such a suit, if the act alleged did fall within the policy period. Thus, the date of favorable termination cannot be regarded as equivalent to the date that the offense is committed."

396 A.2d at 199.

A third reason relates to according the policy language its ordinary and common sense meaning.

> "On the face of it, the simplest reading of when the act of malicious prosecution is committed is when the legal machinery of the state is set in motion. 'The gist of the action is that the plaintiff has been improperly made the subject of legal process resulting in damage ....' 54 C.J.S. *Malicious Prosecution* § 4, at 956; *Earl v. Winne*, 14 N.J. 119, 101 A.2d 535, 543 (1953). *See also* 52 Am.Jur.2d *Malicious Prosecution* § 7. This view is certainly compatible with the cases decided in the District of Columbia and their emphasis on the initiation of state action as the crucial point."

396 A.2d at 199. *See Delk v. Killen*, 201 Md. 381, 383, 93 A.2d 545 (1953) ("The gist of the action is the putting of legal process in operation for the mere purpose of vexation or injury").

A final reason militating against the use of the favorable termination date as the coverage benchmark is that, at least in the criminal context, the alleged tortfeasor has no control over the underlying prosecution. Once the allegedly malicious charge is made, and the claimant arrested or subjected to other legal process, the termination date is largely in the hands of the State. *S. Freedman & Sons, Inc. v. Hartford Fire Insurance Co.*, 396 A.2d at 199 & n.3. *See also Roess v. St. Paul Fire & Marine Insurance Co.*, 383 F.Supp. at 1234.

Applying *Freedman* to this case, there is coverage under the Bituminous policy, respecting the first *Pryseski* inquiry, if an "offense" of malicious prosecution was committed by the insured between January 1, 1976 and January 1, 1977. In other words, there is coverage if the plaintiffs engaged in conduct resulting in the application of the State's criminal process to the Bender claimants during the period in which the policy was in effect.

The original Bender declaration alleges that during "the Bowie Fall race meet in 1976," [17] Bowie and others investigated the claimants for alleged criminal activity. According to the declaration, the "investigation also involved the State's Attorney for Prince George's County." [18] The declaration goes on to allege that the claimants "who refused to resign their jobs were indicted and repeatedly re-indicted beginning in November, 1976 and in 1977 in the District Court and the Circuit Court for Prince George's County, Maryland." [19]

The first amended declaration incorporates these allegations by reference,[20] and the second amended declaration repeats them verbatim.[21]

---

**17.** Paper No. 1, Ex. 3 at ¶ 4.

**18.** *Id.*

**19.** Paper No. 1, Ex. 3 at ¶ 5.

**20.** Paper No. 1, Ex. 4 at 1.

**21.** Paper No. 9, Ex. 1 at ¶¶ 4 & 5.

■ In the court's view, these allegations are sufficient to impose on Bituminous a duty to defend the Bender suit. There is certainly a "potentiality" that the malicious prosecution claim is within the policy coverage under *Brohawn*. The question whether the "offense" was *actually* committed during the policy period, so as to indicate coverage under the first *Pryseski* inquiry, is so "intertwined" with the second inquiry that it must be resolved in the underlying suit. Under the present circumstances, therefore, the court concludes that the Bender declarations are sufficiently specific to support the plaintiffs' motion for partial summary judgment. Accordingly, the court holds that Bituminous has a duty to defend the plaintiffs in the Bender suit. *E.g., Steyer v. Westvaco Corp.*, 450 F.Supp. at 389; *Brohawn v. Transamerica Insurance Co.*, 276 Md. at 407–08, 347 A.2d 842.

■ Bituminous next asserts that, on the present record, there is insufficient evidence of a conflict of interest between itself and the insureds to require it to afford the plaintiffs independent counsel in the Bender suit. The court disagrees.

Bituminous has maintained consistently that the malicious prosecution claim is the only claim in the Bender suit that is even arguably within the policy coverage. Although Bituminous has not moved for summary judgment, the court's rulings on the plaintiffs' motion concerning the Comprehensive General Liability provision suggests that such is likely. Under these circumstances, therefore, there is a serious potential conflict of interest between the interests of Bituminous and the plaintiffs in the Bender suit.

All of the claims in Bender, according to the declarations, are based upon common events and transactions and center around the allegedly improper investigations and resulting indictments. The essential difference between the covered claim and the non-covered claims is the legal theory under which damages are sought. In short, if the Bender claimants were to prevail at all, Bituminous would certainly prefer that they do so with respect to any claim other than the malicious prosecution claim. Under such circumstances, it is not unreasonable for the plaintiffs to be concerned as to the adequacy of representation by counsel not independent of the insurer. Consequently, they are entitled to independent counsel under *Brohawn*.

Finally, Bituminous contends that the plaintiffs must show that an apportionment of costs cannot be made before it can be required either to defend the whole suit or pay independent counsel to do so. This contention appears to have two aspects: (1) that Bituminous should not have to pay for the defense of claims that are not covered by reason of subject matter; and (2) that Bituminous should not have to pay for claims arising outside of the policy period.

As to the first aspect, Bituminous relies on *Loewenthal v. Security Insurance Co.*, 50 Md.App. 112, 436 A.2d 493 (1981). In that case, the claimants' declaration sought damages for certain property damage as well as bodily injury. After construing the policy, the Court of Special Appeals held that there was no coverage as to the type of property damage alleged in the declaration because such damage was within a policy exclusion. 50 Md.App. at 118–20, 436 A.2d 493. There was coverage, however, for the damages sought in connection with the alleged bodily injury. 50 Md.App. at 121–23, 436 A.2d 493. Under these circumstances, the court rejected the insured's contention that the insurer was obligated to pay the cost of defending the entire action, stating:

"Although many courts which have addressed the issue have not permitted apportionment of defense costs between the insurer and the insured, *see, e.g., Tampa Elec. Co. v. Stone & Webster Engineering Corp.*, 367 F.Supp. 27 (M.D.Fla.1973); *Home Ins. Co. v. Pinski Bros., Inc.*, [160 Mont. 219] 500 P.2d 945 (Mont., 1972); *St. Paul Fire & Marine Ins. Co. v. Hodor*, 200 So.2d 205 (Fla.App.1967), the rationale behind these authorities is that an insurer must bear the entire cost of defense only when there is no reasonable means of prorating the costs of defense between excluded and uncovered items. *See Na-*

*tional Steel Const. Co. v. National U. Fire Ins. Co.*, [14 Wash.App. 573] 543 P.2d 642 (Wash.App.1975). *Such a consideration is not the case here since defense costs can be readily apportioned.*"

50 Md.App. at 123 n.5, 436 A.2d 493 (emphasis supplied).

*Loewenthal* is distinguishable from, and is not necessarily inconsistent with, the decisions that have rejected apportionment of defense costs when the insurer wrongfully refused to defend a suit involving covered and non-covered claims. *See Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1224–25 & nn. 22 & 23 (6th Cir. 1980) and authorities cited therein; *Prince v. Universal Underwriters Insurance Co.*, 143 N.W.2d 708, 716–17 (N.D.1966) and authorities cited therein. First, *Loewenthal* involved a situation in which certain claims were not within the policy coverage by reason of an express exclusion. Second, it was practicable in that case to apportion costs, due to the distinct nature of the damage claims set out in the declaration.

Assuming that the Court of Appeals of Maryland would permit, under certain circumstances, apportionment of defense costs, it would be impracticable to do so in this case. Unlike *Loewenthal*, the damages sought in the Bender suit are distinguishable only with reference to the legal theory through which they are sought. *Cf. Hogan v. Midland National Insurance Co.*, 3 Cal.3d 553, 91 Cal.Rptr. 153, 159–60, 476 P.2d 825, 831–32 (Cal.1970) (if costs are to be apportioned at all, burden of showing that apportionment is feasible should rest with insurer, the party which breached the contract). Further, under these circumstances, the insurer's duty to defend initially suits involving covered and non-covered claims would be effectively diminished by requiring an insured to demonstrate that an apportionment of costs was not feasible.

The second aspect of Bituminous' contention concerns the cost of defending

claims relating to "offenses" taking place outside of the policy period. *See Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d at 1224–25. At this juncture it is not possible for the court to determine factually what "offenses," if any, were committed during the operative period of the Bituminous policy, as compared with those committed during the period covered by another policy. Consequently, it is not now feasible, even if a motion were before the court, to apportion costs between insurers. As the plaintiffs have moved only for a declaration as to Bituminous' duty to defend and pay for the defense of the Bender suit, but not for a determination of any specific amount, the issue of apportionment among insurers can be determined at a later time. *See Tampa Electric Co. v. Stone & Webster Engineering Corp.*, 367 F.Supp. 27, 32 (M.D.Fla.1973).

### B. *The Fireman's Fund Policy*

The provisions of the Fireman's Fund policy relied on by the plaintiffs are similar, but not identical, to those contained in the Bituminous policy. The coverage provision of the "Comprehensive General Liability" section of the Fireman's Fund policy provides:

"The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury or

Coverage B. property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been

exhausted by payment of judgments or settlements." [22]

The above-quoted provision was modified by a "General Liability Multi-Cover" endorsement. This endorsement provides, in pertinent part, as follows:

"1. The definition of 'bodily injury' is amended to read: 'bodily injury means (a) bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom, and (b) personal injury committed in the conduct of the named insured's business.

2. When used in this policy, personal injury means:

Group A—false arrest, detention or imprisonment, or malicious prosecution.

Group B—the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting, or telecasting activities conducted by or on behalf of the named insured;

Group C—wrongful entry or eviction, or other invasion of the right of private occupancy; if such offense is committed during the policy period within the United States of America, its territories or possessions, or Canada." [23]

Unlike the Bituminous policy discussed in section A *supra*, the Fireman's Fund policy links endorsement coverage for the offense of malicious prosecution, defined as a type of personal injury, with the occurrence clause of the main coverage provision. Further, the Fireman's Fund policy does not contain a definition of the word "occurrence." [24]

The Court of Appeals held in *Pryseski* that the word "occurrence" is ambiguous in this context, and that the court must consider extrinsic evidence to determine the parties' intent as to coverage. 292 Md. at 198–99, 438 A.2d 282. Even assuming that summary judgment sometimes can be appropriate when the meaning of a key contract term is ambiguous, *cf. Charbonnages de France v. Smith*, 597 F.2d 406, 414–16 (4th Cir. 1979), the plaintiffs have not met their initial burden of showing, through competent evidentiary materials, the absence of a genuine factual dispute as to the meaning of the word "occurrence." [25]

In light of the above determination, the court need not address the other arguments advanced by Fireman's Fund against coverage as to the Bender suit.

For the reasons set out above, it is this 7th day of May, 1982, by the United States District Court for the District of Maryland, ORDERED:

1. The plaintiffs' motion for partial summary judgment as to Fireman's Fund is DENIED;

2. The plaintiffs' motion for partial summary judgment as to Bituminous is GRANTED:

and it is DECLARED, ADJUDGED AND DECREED that:

(a) Bituminous is obligated under its contract of insurance with the plaintiffs to defend them in the so-called "Bender" suit;

(b) The plaintiffs have a right to select their own attorney to defend the "Bender" suit and Bituminous has an obligation to pay the reasonable costs and attorney's fees incurred by the plaintiffs in connection therein; the amount of such fees and costs to be determined by the court in subsequent proceedings in this case;

(c) Bituminous is obligated to pay the reasonable costs and attorney's fees incurred by the plaintiffs in connection with this case; the amount of such fees and costs

---

**22.** Paper No. 1, Ex. 2 at 1.

**23.** *Id.* at 12.

**24.** No definition of "occurrence" appears in the pages of the Fireman's Fund policy entered into the record by the plaintiffs.

**25.** Consequently, the court cannot presently determine whether any of the other claims in the Bender suit are within the policy coverage.

to be determined by the court in subsequent proceedings in this case;

and it is FURTHER ORDERED that the Clerk forward a copy of this Memorandum and Order to counsel for the parties.