674 A.2d 65

**LAWYERS TITLE INSURANCE CORPORATION**

**v.**

**Michael KNOPF, et al.**

**No. 987, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

April 1, 1996.

Paul T. Glasgow (Paula T. Laboy and Venable, Baetjer and Howard, on the brief), Rockville, for Appellant.

Peyton Paul Phillips, Frederick, for appellees, Michael and Suzanne Knopf.

Gail B. Landau, Chevy Chase, on the brief, for Liberty Savings Bank.

Argued before WILNER, C.J., EYLER, J., and PAUL E. ALPERT, J. (Retired), Specially Assigned.

PAUL E. ALPERT, Judge, Specially Assigned.

This appeal involves questions concerning a title insurance company's obligation to defend its insureds. It marks the second attempt by the insurer, Lawyers Title Insurance Corporation ("Lawyers Title"), to obtain review by this Court of the trial court's rulings on the insurer's separate motions for summary judgment against two insureds and the insureds' separate motions for partial summary judgment.

## Facts

We declined to consider the first appeal, brought immediately after the trial court's rulings on the motions, because the orders appealed from adjudicated fewer than all of the claims in the action. In doing so, we set forth the facts of the case as follows:

On June 23, 1989, William H. and Katherine Baldwin filed a complaint in ejectment against appellees, Michael and

Suzanne Knopf, and later amended the complaint to include appellee Liberty Savings Bank, F.S.B. ("Liberty") as a defendant in its capacity as the holder of a lien on the Knopfs' property. The Baldwins alleged that a 9.982 acre parcel of land owned by them included 3.182 acres of the 6+ acres purchased by the Knopfs in 1981 and that the Knopfs, after purchasing the property in 1981, took wrongful possession of this portion of the Baldwins' land and constructed a house on it. A survey commissioned by the Baldwins, which supported their claim, was attached to the complaint.

Seymour Stern, Esq. had conducted the 1981 settlement in which the Knopfs acquired the property. In a letter dated April 28, 1991 to Liberty's predecessor in interest, First Federal Savings & Loan Association, Mr. Stern outlined his concerns with the title to the property. He stated that with regard to the property the Knopfs planned to purchase: (1) "there was no Plat on record for this subdivision" and (2) "[in] addition ... there are some potential problems that should be addressed by the surveyor before we will be able to acquire title insurance." Mr. Stern explained that the prior deeds for what he believed to be the property variously described it as containing 9 acres, 15.161 acres, and 55 acres. In another letter to the bank, dated May 5, 1981, Mr. Stern stated that he had met with the surveyor, who had resolved certain discrepancies. After noting that the surveyor had completed his survey, Mr. Stern advised that his (Mr. Stern's) underwriter would not insure the title unless further title work on the neighboring properties was done. Rather than incur this expense, Mr. Stern suggested that the title insurance policy recite that an acreage problem existed but that insurance was provided against loss "by reason of adverse possession to the property insured by reason of the aforesaid discrepancy."

Lawyers Title had issued a policy of title insurance to Charles Crothers when he had purchased the property, a portion of which he now proposed to sell to the Knopfs. In an effort to procure title insurance so that the sale to the

Knopfs could be consummated, Mr. Stern, through his agent, wrote to Lawyers Title, in a letter dated May 13, 1981. He advised Lawyers Title that the "plat of subdivision (for the Knopfs' lot) has been submitted for approval but has not yet been approved" and inquired if Lawyers Title would issue a policy of title insurance in accordance with the terms of his May 5, 1981 letter to the bank. In a letter dated May 20, 1981, Lawyers Title indicated that it was aware of the discrepancies in the "acreage recitations in various deeds in the chain of title," and would be "pleased to insure the conveyance out of Mr. Charles Williams Crothers subject to the present conditions of title," but that "without a current survey of the specific property presently being acquired out of a larger tract, we cannot give survey coverage." Lawyers Title explained:

> [t]he policy issued to Mr. Crothers insures boundaries and does not insure acreage content. No claim has been presented under the policy by adjoining owners and no loss is provable thereunder. I frankly do not see any problem with the Crothers property.

Lawyers Title concluded that the language suggested by Stern would "limit the marketability coverage of the policy"; Lawyers Title "decline[d] to include such language in a policy which creates an issue of coverage where none exists." Five days later, on May 26, Lawyers Title wrote to an attorney representing Crothers, the seller, and stated that:

> We have advised Mr. and Mrs. Knopf, purchasers of a portion of the property, as well as Mr. Stern that we will insure title *without exception to the acreage discrepancy. Since the new conveyance will convey less than the entire property previously insured, we will have a survey exception unless a current survey is furnished.*

(emphasis added). On the same day, May 26, the subdivision plat that included the Knopf lot was approved and recorded among the plat records of Frederick County.

On June 5, 1981, settlement was held and the Knopfs acquired title to the property at issue here. Upon the

payment of the requested premium, Lawyers Title issued a title insurance policy to the Knopfs. Schedule A of that policy describes the real property being insured as follows:

All that lot or parcel of land situate, lying and being in the Tuscarora Election District, Frederick County, Maryland, and being known and designated as Lot No. 1, Section 1, as set forth on the Plat entitled "HIGH KNOB EAST" and recorded in Plat Book 24, Plat 47, among the Plat Records for Frederick County, Maryland.

Being all and the same real estate which was conveyed unto Michael W. Knopf and Suzanne Knopf, his wife, by Charles William Crothers, by deed dated the 5th day of June, 1981, and recorded in Liber 1148, folio 311, among the Land Records for Frederick County, Maryland.

Insurance was to be provided "against loss or damage . . . and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;

2. Any defect in or lien of encumbrance on such title;

3. Lack of a right of access to and from the land; or

4. Unmarketability of such title.

The policy further provides that Lawyers Title "at its own cost and without undue delay, shall provide for the defense of an insured in all litigation . . . against such insured . . . to the extent that such litigation is founded upon an alleged defect, lien, encumbrance, or other matter insured against by this policy."

Among those items expressly excluded from coverage were:

. . . . .

Rights or claims of parties in possession and easements or claim of easements not shown by the public records, boundary line disputes, overlaps, encroachments and any

matter not of record which would be disclosed by an accurate survey and inspection of the premises.

Liberty obtained a similar policy from Lawyers Title. That policy also insured against loss caused by an defect in or lien or encumbrance on such title, and provided for the defense of actions founded upon an alleged defect insured against by the policy. The policy provided to Liberty also specifically excluded the items noted above, including "[s]uch state of facts as would be disclosed by an accurate survey and inspection of the premises."

Eight years after the Knopfs settled on their property the instant case was filed by the Baldwins against the Knopfs; the Baldwins eventually amended the complaint to join Liberty as an additional defendant. The Knopfs filed a third party claim and Liberty filed a cross-claim against Lawyers Title, among others, for breach of contract, alleging that, under its title insurance policy, Lawyers Title was obligated to provide a defense to any action based on a defect in title. Both the Knopfs and Liberty filed motions for partial summary judgment, with supporting exhibits, against Lawyers Title, contending that the boundary dispute at issue was covered by their respective title policies, and that Lawyers Title was therefore obligated to provide them a defense to the Baldwins' action. Lawyers Title responded to these motions and filed its own motions for summary judgment, with supporting exhibits, against the Knopfs and Liberty, claiming that the dispute at issue was specifically excluded from coverage. (All of the acts set forth above are undisputed and are based on the pleadings, motions, and exhibits to them).

After hearing argument from counsel, the circuit court issued orders denying Lawyers Title's motions for summary judgment and granting the motions for partial summary judgment of the Knopfs and Liberty.

Specifically, the lower court mandated that Lawyers Title "provide a defense" to both the Knopfs and Liberty against the Baldwins' action, and "reimburse" the Knopfs and Lib-

erty for the legal expenses and costs they had incurred to date in defending the litigation.

*Lawyers Title Insurance Corporation v. Knopf*, 100 Md.App. 799, 800, No. 1337, September Term, 1993, at 1–6 (April 25, 1994) (*per curiam* ) (footnotes omitted).

Subsequently, the underlying action in ejectment was settled and the complaint and cross-complaints were dismissed. The trial court entered two money judgments against Lawyers Title for the costs and attorneys' fees incurred by the Knopfs and Liberty.

### Discussion

In ruling upon Lawyers Title's motions for summary judgment and the motions for partial summary judgment filed by the Knopfs and Liberty, the trial court stated:

The problem is although Mr. Stern shared the concern that he expressed, apparently Lawyers Title did not at the time. Which leads into question whether or not there is that survey exception. And whether or not it was satisfied when the subdivision was placed on record. That is the problem that I foresee in granting summary judgment [in favor of Lawyers Title]. I do not believe that it is clear. First of all I have some question as to whether or not this particular problem does not concern superior title to real estate or marketability of title rather than a surveyor's exception. And secondly, I think it's questionable as to when this plat went on record in relation to the exception, if that's what it is, a survey exception, whether or not the parties construed this to have satisfied that. Therefore, I think there is disputed facts and I'm going to deny your Motion[s] for Summary Judgment.

As to the motion[s] for partial summary judgment, I would think quite truthfully under *Brohawn* there's, the defense provision is clear, there really has been no determination as to coverage or in essence whether or not any plat is correct. I think it's clear that Lawyers owes a defense to both Knopf and Liberty Savings Bank. Therefore, I'm going to grant their motions for partial summary judgments

as far as requiring Lawyers Title Insurance to provide a defense and also reimburse the parties for the legal expenses they have incurred and the costs in connection with the litigation.

Lawyers Title now contends that the trial court erred by denying its motions for summary judgment and granting the motions for partial summary judgment filed by the Knopfs and Liberty, thus ordering it to defend the Knopfs and Liberty against the Baldwins' action in ejectment. Lawyers Title argues, in essence, that the trial court's rulings were based on an erroneous belief that Lawyers Title was required to defend the Knopfs and Liberty if the terms of their title insurance policies could potentially be construed to provide coverage. It adds that, in any event, the survey exception contained in the policies indisputably excluded coverage. The Knopfs counter that the trial court's understanding of the law was correct and that Lawyers Title waived the survey exception in their policy when the insurer described the property in question by reference to the subdivision plat that was recorded several days before the policy was issued. In the Knopfs' view, the subdivision plat was, in effect, a survey. The Knopfs and Liberty further contend that, even if the survey exception was valid, their cross-complaints against Lawyers Title were based on a failure of title rather than a mere encroachment or boundary dispute. They suggest that a survey exception could not be applicable to such a situation.

■ Preliminarily, we shall address the Knopfs' and Liberty's contentions that a valid survey exception could not be applicable to what they characterize as a failure of title. As we have observed, the title insurance policy in question obligates Lawyers Title to defend and pay any loss due to:

 1. Title to the estate or interest described in Schedule A being vested otherwise than as stated herein;

 2. Any defect in or lien of encumbrance on such title;

 4. Unmarketability of such title.

Liberty asserts in its brief that, even if we were to assume that the subdivision plat had not "satisfied" the survey exception, "Lawyers Title would still have to defend this action based upon its contract to compensate loss due to superior title and loss of marketability of title." The Knopfs make a similar suggestion in their brief. Neither Liberty nor the Knopfs cite any authority to support their positions, however, and we know of none. It is well-recognized that "[u]nder the provisions of some policies, defects of title created, suffered, assumed, or agreed to by [the] insured are not covered." 46 C.J.S. *Insurance* § 1066 at 450 (1993). Indeed, "[a] title insurance policy may except coverage for loss or damage by reason of encroachments, overlaps, boundary line disputes, *or other matters* which would be disclosed by an accurate survey or inspection of the premises." *Id.* at 451 (emphasis added). In *Heyd v. Chicago Title Ins. Co.*, 218 Neb. 296, 354 N.W.2d 154, 155 (1984), The Supreme Court of Nebraska had before it a title policy that provided, in pertinent part: "This policy does not insure against loss or damage by reason of ... [e]ncroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises." In interpreting the policy, the court said:

> Regarding policies such as that involved in the case before us, it is settled that a standard policy of title insurance is a contract of indemnity which only insures against defects, discrepancies, or other impediments of record affecting title to the real estate designated in the policy or interfering with the marketability of title to the land described in the policy. Such indemnification does not protect the insured from matters dependent upon a survey or critical inspection of the property unless the policy provides for extended coverage or the insured requests special endorsements.

The provision in question denies coverage for "*any* matter not of record which would be disclosed by an accurate survey and inspection of the premises," not just for minor boundary disputes or encroachments that would thereby be disclosed.

■ We turn now to Lawyers Title's contention that the trial court's rulings were based on the erroneous belief that Lawyers Title was required to defend if the terms of the title insurance policies could potentially be construed to provide coverage. In *St. Paul Fire & Marine Insurance Co. v. Pryseski*, 292 Md. 187, 193, 438 A.2d 282 (1981), the Court of Appeals opined:

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit. At times these two questions involve separate and distinct matters, and at other times they are intertwined, perhaps involving an identical issue.

(explaining *Brohawn v. Transamerica Insurance Co.*, 276 Md. 396, 408, 347 A.2d 842 (1975)). In our view, the reasoning behind the two-part test for determining whether a liability insurance company must defend against a tort claim is equally applicable to determining whether a title insurer must defend against an action in ejectment. *See Cheverly v. Ticor*, 100 Md.App. 606, 610, 642 A.2d 285 (1994) (two-part test used to determine whether title insurer was required to defend against a claim of adverse possession or implied easement).

While the *Pryseski* Court suggested in *dicta* that the two questions might be intertwined, it went on to explain:

> The "rule" ... that the insurer has a duty to defend if the allegations of the tort suit raise a "potentiality" that coverage exists [ ] is generally applicable only to the second question set forth above. It may, however, be applicable to an issue raised under the first question set forth above if that issue must also be resolved in the underlying tort suit.

Normally, however, when the question of coverage or defenses under the language or requirements of the insurance policy is separate and distinct from the issues involved in the tort suit, the "potentiality rule" relied on by the court below has no application. Instead, . . . it is the function of the court to interpret the policy and decide whether or not there is coverage. *If such a coverage issue depends upon language of the policy which is ambiguous, the court . . . nevertheless must resolve the ambiguity in favor of the insured before it can conclude that the insurer has or had an obligation to provide a tort defense.*

292 Md. at 193–94, 438 A.2d 282 (emphasis added). Indeed, one commentator has remarked:

It is perhaps doubtful whether the two parts of the comparison test can be intertwined, much less whether they involve the identical issue. Conceptually, the test always involves two separate inquiries, even if the court decides to frame the inquiries into one question. The *Pryseski* court's statement that the first and second inquiries of the comparison test may be intertwined or involve the identical issue, then, merely reflects the fact that the court cannot determine on the basis of the pleadings whether the insurer has a duty to *indemnify* where factual issues must be resolved in the underlying tort action. Viewing the two parts as intertwined confuses the test for determining the insurer's duty to defend with the test for determining the insurer's liability under its duty to indemnify. The scope of the insurer's duty to indemnify (what the policy covers), however, can be determined in the first prong of the comparison test. Once the scope of the duty to indemnify is ascertained, the allegations of the claimant's pleadings can then be analyzed to see if they fall within the policy's coverage.

Andrew Janquitto, *Insurer's Duty To Defend in Maryland,* 18 U.Balt.L.Rev. 1, 21–22 (Fall 1988). *See Northern Assurance Co. of America v. EDP Floors, Inc.,* 311 Md. 217, 225–26, 533 A.2d 682 (1987) (rejecting an insured's suggestion that the terms of a general business liability policy could potentially be construed to cover its claims, and commenting that "[t]o apply

the 'potentiality rule' in this case as [the insured] seeks would in effect create a canon of insurance contract interpretation that gives every benefit of the doubt to the insured, in contravention of our many holdings that the unambiguous language in an insurance contract is to be afforded its ordinary and accepted meaning"). *Compare Ohio Casualty Insurance Co. v. Lee*, 62 Md.App. 176, 187–89, 488 A.2d 988, *cert. denied*, 303 Md. 471, 494 A.2d 939 (1985) (explaining that the two questions were intertwined and that potentiality of coverage existed where a car wash's insurance policy excluded bodily injury caused by an employee's negligence, but the injury was caused by a director/stockholder who may or may not have been acting as an employee).

As Lawyers Title contends, the trial court's comments in the instant case reflect that the court considered the two questions set forth in *Pryseski* as one and that, therefore, the court necessarily applied the potentiality of coverage rule to the first question. The court thus concluded, in essence, that the policy could potentially be construed to cover the situation at hand. In so applying the test, the trial court erred. There was no reason why the court could not determine whether the survey exception remained applicable and construe the policy before determining whether the complaint for ejectment brought the matter within the terms of the coverage. The court could and should have first conclusively determined the scope of the coverage.

That established, we hasten to add that, on this record, the scope of the policy's coverage could not properly have been determined in summary judgment proceedings. Although the parties contended below that there were no disputes as to any material facts, *see* Md.Rule 2–501, a review of their respective motions and attachments reveals that there are, in fact, several disputes that must be resolved before the policy can be construed. There is considerable dispute as to whether Lawyers Title accepted the subdivision plat referenced in the policy in lieu of an "accurate survey and inspection of the premises." Although the motions for partial summary judgment filed by the Knopfs and Liberty suggest that

the subdivision plat substituted for a survey and therefore extinguished the survey exception, the affidavit of Lawyers Title claims counsel Alexander E. Conlyn, which was attached as an exhibit to each of Lawyers Title's motions for summary judgment, states unequivocally: "There is no survey whatsoever attached to, a part of, incorporated by, or referenced in the Policy." [1] The letters between Seymour Stern, Lawyers Title, and Liberty's predecessor, First Federal Savings & Loan Association, that are attached to the various motions, reflect confusion about the subject. Additionally, while Lawyers Title suggests that an accurate survey and inspection of the premises would have disclosed the problem, there is nothing in the record to indicate that that is so.

 If the court had denied the motions for partial summary judgment, as it did Lawyers Title's motions for summary judgment, the disputed factual issues might have been resolved at trial prior to the resolution of the ejectment action in a manner similar to a declaratory judgment proceeding or as part of the ejectment action, or subsequent to resolution of the ejectment action. For instance, title experts might have offered evidence that the title problem would have been revealed through an appropriate title examination. On the other hand, title experts might have offered proof that the nature of the problem was something not susceptible of ascertainment through title examination but only through an accurate survey. Because the court granted the motions and the underlying action in ejectment was settled, there were no findings of fact, nor was there a construction of the policy by the trial judge. The trial judge should have determined whether the survey exception was applicable, determined that

---

1. The Knopfs assert in their brief that, *as a matter of law,* the subdivision plat was a survey within the meaning of the policy. (Emphasis added.) The assertion is erroneous. The survey exception in the policy refers to "an accurate survey and inspection of the premises." The policy clearly contemplates a current, on-site examination and measurement of the property. The subdivision plat, although apparently prepared by a surveyor, was not necessarily based on such an examination and/or such measurements.

the policy was unambiguous and construed its terms or, alternatively, determined that it was ambiguous and ascertained the intention of the parties in the light of extrinsic evidence. *See Waterview Assoc. Inc. v. Lawyers Title Ins. Corp.*, 30 Mich.App. 687, 186 N.W.2d 803 (1971). Under the circumstances, we must vacate the judgments of the circuit court in favor of the Knopfs and Liberty against Lawyers Title and remand the case to that court for further proceedings, consistent with this opinion, to make the factual findings necessary and to construe the title insurance policy. We remind the trial court that, "[i]n determining coverage under an insurance policy, [the court must] initially focus on the terms of the insurance policy to determine the scope and limitations of its coverage." *Chantel Associates v. Mt. Vernon Fire Insurance Co.*, 338 Md. 131, 142, 656 A.2d 779 (1995). *See also Aetna Casualty & Surety Co. v. Cochran*, 337 Md. 98, 104, 651 A.2d 859 (1995). "In construing the terms of the insurance contract, [the court] must accord the terms their 'customary, ordinary, and accepted meaning.'" *Id.* "In the event of an ambiguity in the terms of a contract, the courts must necessarily look to the intention of the parties at the time of the making of the contract." *Hardy v. Brookhart*, 259 Md. 317, 326–27, 270 A.2d 119 (1970).

**JUDGMENTS OF THE CIRCUIT COURT FOR FREDERICK COUNTY IN FAVOR OF THIRD PARTY PLAINTIFFS AGAINST THIRD PARTY DEFENDANT LAWYERS' TITLE VACATED AND REMANDED FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLEES.**