PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHICAGO TITLE INSURANCE COMPANY,
　　　　　*Plaintiff-Appellant,*

v.

100 INVESTMENT LIMITED
PARTNERSHIP,

　　　　　*Defendant-Appellee.*

No. 02-2474

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-02-1138-JFM)

Argued: December 4, 2003

Decided: January 22, 2004

Before NIEMEYER, MICHAEL, and GREGORY, Circuit Judges.

---

Affirmed in part and reversed in part by published opinion. Judge Niemeyer wrote the opinion, in which Judge Michael and Judge Gregory joined.

---

## COUNSEL

**ARGUED:** Richard Eugene Hagerty, TROUTMAN SANDERS, L.L.P., McLean, Virginia, for Appellant. James E. Carbine, JAMES E. CARBINE, P.C., Baltimore, Maryland, for Appellee. **ON BRIEF:** Cathryn A. Le, TROUTMAN SANDERS, L.L.P., McLean, Virginia, for Appellant.

**OPINION**

NIEMEYER, Circuit Judge:

In this appeal, we determine whether, under Maryland law, a title insurance company must indemnify its insured for (1) expenses incurred by the insured to resolve a defect in title to land when the expenses were incurred after the insured conveyed the land away; and (2) the cost of defending an action for trespass filed after the policy period, based on damage sustained during the policy period. The district court entered summary judgment, holding that the insurance company was responsible for both the expenses incurred in resolving the defect in title and the costs of defending the trespass action.

For the reasons that follow, we reverse the district court's ruling that the expenses incurred by the insured in resolving the title defect were covered, and we affirm its ruling requiring a defense of the trespass action.

I

In 1986, 100 Investment Limited Partnership ("100 Investment") assembled a 300-acre tract of land in Howard County, Maryland, which it intended to develop for residential homes. As part of the assemblage, 100 Investment purchased a 1.145-acre tract from Frances L. Miller and Mildred C. Miller, sisters-in-law, receiving from them a special warranty deed dated October 14, 1986. In connection with the 300-acre assemblage, 100 Investment purchased title insurance from Safeco Title Insurance Corporation, paying a premium of more than $7 million. The effective date of that title policy was December 18, 1986.

In furtherance of its development efforts, 100 Investment subdivided the 300-acre tract and subjected it to a "Declaration of Covenants, Easements, Charges and Liens." It also deeded common areas to the Lyndwood Association, Inc., a homeowners association. The 1.145-acre Miller tract itself became part of a conveyance that 100 Investment made to a homebuilder, NVR Homes, Inc. The deed to NVR Homes, dated July 7, 1995, included only a special warranty —

"Grantor covenants that it will warrant specially the property hereby granted and conveyed."[1] NVR Homes ultimately conveyed the 1.145-acre Miller tract, now subdivided, to three separate homeowners.

As it turned out, some four years before 100 Investment purchased the 1.145-acre Miller tract, the Millers had conveyed the same property to the Ahsan S. Khan, M.D., P.A., Profit Sharing Plan ("Khan Profit Sharing Plan"), and in 2001, Dr. Khan conveyed the 1.145-acre Miller tract to Meadowridge Properties, Inc. Meadowridge Properties, in turn, conveyed the property to Courtyards at Timbers, LLC, a developer that was also assembling property. When 100 Investment learned in July 2001 of this competing conveyance, it repurchased the 1.145-acre Miller tract from Courtyards at Timbers for $175,000, enabling 100 Investment then to "clean up" title to the 1.145-acre tract that it had conveyed to NVR Homes.

Also, in March 2002, Dr. Khan commenced an action against 100 Investment for trespassing on the 1.145-acre Miller tract during the period 1986-1995, when 100 Investment purportedly owned the tract.

100 Investment notified Chicago Title Insurance Company, the successor to Safeco Title Insurance Corporation, of the double conveyance and requested that Chicago Title indemnify 100 Investment for the $175,000 that it paid to repurchase the 1.145-acre Miller tract, plus the costs of reacquisition. In addition, shortly after Dr. Khan commenced the trespass action, 100 Investment requested that Chicago Title defend it in that litigation. Chicago Title denied both requests, stating that when 100 Investment conveyed the 1.145-acre Miller tract to NVR Homes in July 1995, its coverage with respect to that property ended.

Chicago Title then commenced this action for a declaratory judgment that its coverage determinations were correct. 100 Investment filed a counterclaim for a determination that it was covered and for damages, with respect to both the reacquisition of the 1.145-acre Mil-

---

[1]A covenant of special warranty protects the grantee against any defect in title created by the grantor but not against any defect created by the grantor's predecessors. *Kendall v. Rogers*, 31 A.2d 312, 314 (Md. 1943); *see also* Md. Code Ann. Real Prop. § 2-106.

ler tract and the defense of the Khan litigation. The parties stipulated to the operative facts, and the district court decided the case on cross-motions for summary judgment. In entering judgment in favor of 100 Investment, the district court concluded that Chicago Title was obligated both to indemnify 100 Investment for the expenses of reacquiring the 1.145-acre Miller tract and to provide 100 Investment with a defense in the Khan litigation. The court entered a money judgment in favor of 100 Investment in the amount of $201,744.37 for the cost of acquiring the 1.145-acre Miller tract and $64,123.29 for attorneys fees incurred in defending the Khan litigation, plus any additional expenses that 100 Investment might incur in that litigation.

From the district court's judgment, Chicago Title filed this appeal.

II

Chicago Title argues that because 100 Investment "completely disposed of any purported interest 100 Investment had in the Disputed Tract, 100 Investment was no longer covered under the General Statement of Coverage" contained in the title insurance policy. Chicago Title also argues that because the deed by which 100 Investment conveyed the disputed trust to NVR Homes did not contain a warranty of title, coverage terminated in 1995 when the tract was conveyed.

100 Investment contends that under the terms of the title insurance policy, so long as 100 Investment owned any interest in the "land," defined by the policy to comprise the 300-acre assemblage, coverage continued after 100 Investment's conveyance of the Miller tract to NVR Homes. 100 Investment continued to own 12 acres of the 300-acre tract, so in its view, it was still covered under the policy. Alternatively, 100 Investment contends that coverage continued after the Miller tract conveyance because 100 Investment continued to have warranty obligations in connection with the Miller tract. These obligations arose, according to 100 Investment, when (1) it subdivided the property and certified the plat; (2) it imposed the Declaration of Covenants on the 300-acre assemblage, stating that 100 Investment was "the owner of all [the] land"; and (3) it represented to the homeowners association in its conveyance of common areas that it had effectively subdivided the property and imposed restrictions on "all of [the] real property in [the assemblage]." The representations made in those doc-

uments were, it argues, "covenants of warranty" that imposed on 100 Investment continuing obligations after its conveyance to NVR Homes — obligations for which it was covered by the policy.

Our resolution of these coverage issues is governed by the contractual terms contained in the insurance policy. Under Maryland law, which applies in this case based on diversity jurisdiction, insurance policies are to be construed as are any other contracts. *See Catalina Enterprises, Inc. Pension Trust v. Hartford Fire Ins. Co.*, 67 F.3d 63, 65 (4th Cir. 1995). Accordingly, courts applying Maryland law to insurance contracts must, as with any other contract, "ascertain and give effect to the intentions of the parties at the time of contracting." *Id.*

By its terms, the title insurance policy in this case insured 100 Investment "against loss or damage . . . sustained or incurred by the insured by reason of [t]itle to the estate or interest described in Schedule A [a fee simple interest in the 300-acre assemblage] being invested otherwise then as stated therein." The policy states that coverage is subject to the exclusions, exceptions, conditions, and stipulations contained in it. One of the "Conditions and Stipulations" in the policy provided that coverage would continue "as long as [the] insured retains an estate or interest in the land . . . or so long as such insured shall have liability by reason of covenants of warranty made by such insured in any transfer or conveyance of such estate or interest." In short, the policy provided coverage for as long as the insured "retain[ed] an estate or interest in the land," and the coverage extended for as long as the insured had "liability by reason of covenants of warranty" given in the transfer of the land.

A natural reading of this policy language evinces the intent of the parties to limit the scope of title protection to the period running from the effective date of the policy until the insured conveys away its interest in the land, unless, in the conveyance, the insured gives warranties to the grantee. If the insured does give a warranty to the grantee, coverage extends to protect the insured's obligation under that warranty. But if it does not, then title insurance for that land ends, and any risk of loss for defective title becomes the problem of the new owner.

The allocation of risk by this agreement gives title insurance coverage to the insured during the period when the insured purportedly owns the property, when most of the adverse consequences due to a defective title would occur. If a preexisting defect in title were to remain after the insured conveyed the land, the risk inherent in that defect would pass to the purchaser and the insured would no longer have risk, nor coverage. Of course, if the insured were to warrant the property against title defects, then the insured would be retaining the risk of a defective title, and coverage would continue for that risk. Thus, if the conveyance were accomplished by a deed containing a special warranty, the insured would be conveying no more than what it received from its grantor, and coverage would end with the conveyance.[2]

In the circumstances of this case, 100 Investment purchased the 1.145-acre Miller tract with a defective title. When it conveyed that tract to NVR Homes in July 1995, it passed the defective title to NVR Homes, and it did not, in that conveyance, warrant that it had good title or that title was free from defects. It gave a special warranty, promising only that 100 Investment had not itself created any defect in title — a warranty whose breach would be specifically excluded from coverage. At the point of conveyance to NVR Homes, any preexisting defect in title became NVR Homes' problem, and NVR Homes would have to obtain its own title insurance to protect itself from any problem that might be caused by that defect. *See Gebhardt Family Investments, L.L.C. v. Nations Title Ins. Co. of N.Y., Inc.*, 752 A.2d 1222, 1227 (Md. Ct. Spec. App. 2000). Thus, when 100 Investment undertook to correct the preexisting defect in title to the 1.145-acre Miller tract after that tract had been conveyed to NVR Homes, 100 Investment was doing more than what it promised in its deed, and therefore it was incurring expenses that were not covered by the title insurance policy.

100 Investment argues that the coverage limitation should not apply in this case. It reasons that by the language of the policy, cover-

---

[2]Breach of a special warranty would not be covered under the coverage extension, as the policy excluded "[d]efects, liens, encumbrances, adverse claims, or other matters . . . attaching or created subsequent to" the date the policy went into effect.

age continues in force "so long as such insured retains an estate or interest in the land." Because 100 Investment retained "land," specifically 12 acres of the 300-acre assemblage, even after it conveyed the 1.145-acre Miller tract, coverage continued with respect to the entire 300-acre assemblage. We find this argument unpersuasive. If the policy language were to be read in such a mechanical way, it could just as easily be construed to mean that because the term "land" referred to the unreduced 300-acre assemblage, once 100 Investment sold a single one-acre parcel of the 300-acre assemblage, it would therefore no longer have retained "an estate or interest in the land," defined to be the 300-acre assemblage. Accordingly, it would lose coverage for the entire 300-acre assemblage the day it sold the first one-acre parcel. After all, the 299 acres would not, under this method of interpretation, constitute "land" if it is to be defined as the entire 300-acre assemblage. This mechanical reading, of course, would reach an absurd result, but no more so than the reading suggested by 100 Investment. As we have noted, "[i]t is axiomatic under Maryland law that a court should avoid reading a contract in a way that produces an absurd result, especially when a reasonable interpretation is available." *Catalina Enterprises*, 67 F.3d at 66 (citing *Ensor v. Wehland*, 221 A.2d 699, 702 (1966)). Such a reasonable interpretation is available here. Based on the two disjunctive conditions for continued coverage — (1) ownership or (2) continued liability through covenants of warranty — the parties intended to extend coverage during ownership and thereafter only to the extent that the insured bore the continuing risk of a defect in title. Unless 100 Investment gave a general warranty of title when it conveyed the 1.145-acre Miller tract to NVR Homes, it was no longer responsible for a preexisting title defect in the Miller tract when it conveyed that property to NVR Homes. Stated in the contractual terms of the policy, when 100 Investment conveyed the 1.145-acre Miller tract to NVR Homes, it no longer held "an estate or interest in the land," and it did not convey the tract with a warranty of title. Under this interpretation, which we find reasonable, 100 Investment would, of course, continue to have title protection for the 12 acres that it still owned.

Finally, 100 Investment argues that it did, in effect, give covenants of warranty when it conveyed the 1.145-acre Miller tract because its conveyance to NVR Homes was subject to (1) a certificate given to Howard County that 100 Investment had effectively laid out its plan

for subdividing the 300-acre assemblage, including the 1.145-acre Miller tract; (2) the Declaration of Covenants imposing restrictions on all of the land; and (3) the deed for common areas granted to the homeowners association. But none of these documents contains any language warranting title to the 1.145-acre Miller tract against actions taken by previous owners of the tract, nor do they include the statutory language that Maryland law sets out as an available shortcut for creating a general warranty. *See* Md. Code Ann. Real Prop. §§ 2-105 to 2-112. The most that 100 Investment can argue is that it represented generally that it was the "owner" of the 300-acre tract that included the 1.145-acre Miller tract. To infer from this language, however, that 100 Investment warranted the title of the 1.145-acre Miller tract in its conveyance to NVR Homes would be exactly the kind of implied warranty of title that Maryland law refuses unequivocally to recognize. *See id.* § 2-115.

In sum, 100 Investment's conveyance of the 1.145-acre Miller tract in July 1995 terminated any insurance coverage as to defects in title to that tract because the conveyance ended 100 Investment's "estate or interest" in that tract and because 100 Investment did not give a general warranty of title. Accordingly, Chicago Title is not responsible for the expenses incurred by 100 Investment six years later, when it volunteered to resolve a preexisting defect in title to the 1.145-acre Miller tract by repurchasing that tract and reconveying it to NVR Homes and its purchasers. In this respect, we reverse the contrary conclusion reached by the district court.

### III

Chicago Title also contends that the termination of coverage in 1995 for the 1.145-acre Miller tract likewise ended 100 Investment's coverage for the defense of the Khan litigation. The complaint in that litigation was filed in 2002, years after the conveyance of the 1.145-acre Miller tract.

100 Investment argues that although the Khan litigation was filed in 2002, the damage for which the claims were asserted arose because of the defective title to the 1.145-acre Miller tract during the period before 100 Investment conveyed the tract to NVR Homes. Thus, it contends that even though the *claim was made* after the termination

of coverage in 1995, the *claim occurred* before that date, requiring Chicago Title to provide a defense.

We agree with 100 Investment. Insofar as the basis of the Khan litigation was a dispute over title to the 1.145-acre Miller tract while 100 Investment was still the purported owner of the tract, the policy covers the loss or damage. The policy provides that it insures against any "loss or damage . . . and costs, attorneys' fees and expenses which [100 Investment] may become obligated to pay" during the policy period because of a title defect.

Chicago Title argues that while 100 Investment may have been insured during the period when 100 Investment purportedly owned the 1.145-acre Miller tract, after it conveyed the tract to NVR Homes, it was no longer insured for that tract. Accordingly, it argues, a claim made in 2002 for damage sustained during the policy period must be denied. We find this argument inconsistent with the language of the policy.

There is no language in the policy identifying it as a "claims-made" policy, covering an insured only for claims that are asserted during the policy period. To the contrary, the language of the policy does not refer to claims, but rather to loss or damage. The insuring language provides that Chicago Title "insures, as of [December 18, 1986], against *loss or damage* . . . which [100 Investment] may become obligated to pay hereunder" (emphasis added). The policy, rather than providing insurance for any "claim" asserted during the policy period, provides that it covers any "loss or damage" during the policy period. In this case, the policy period for the 1.145-acre Miller tract was from December 18, 1986 until July 7, 1995, and the loss or damage alleged in the Khan litigation occurred during that period.

Accordingly, we affirm the district court's rulings relating to Chicago Title's obligations to provide 100 Investment a defense in the Khan litigation.

IV

In summary, we reverse the district court's ruling that Chicago Title is obligated to indemnify 100 Investment for the expenses it

incurred in resolving the defect in title to the 1.145-acre Miller tract, and we affirm the district court's ruling that Chicago Title had a duty to provide a defense to 100 Investment in the trespass suit brought by the Khan Profit Sharing Plan.

AFFIRMED IN PART AND REVERSED IN PART