75 A.3d 394

BACK CREEK PARTNERS, LLC

v.

FIRST AMERICAN TITLE INSURANCE COMPANY.

No. 492, Sept. Term, 2012.

Court of Special Appeals of Maryland.

Sept. 6, 2013.

704

Ethan L. Don (Roy I. Niedermayer, Paley, Rothman, Goldstein, Rosenberg, Eig & Cooper, Chtd., on the brief), Bethesda, MD, for Appellant.

Morton A. Faller (Shulman, Rogers, Gandal, Pordy & Ecker, PA, on the brief), Potomac, MD, for Appellee.

Panel: DEBORAH S. EYLER, NAZARIAN and J. FREDERICK SHARER (Retired, Specially Assigned), JJ.

NAZARIAN, J.

This case is about title insurance, specifically what it does and doesn't cover. Back Creek Partners, LLC ("Back Creek") seeks (after the fact) to recover the attorneys' fees and costs it incurred in defending itself (successfully) in a lawsuit sorting out the easement and access rights in a waterfront community Back Creek developed. The Circuit Court for Montgomery County granted summary judgment to Back Creek's insurer, appellee First American Title Insurance Company ("First American"). We agree that the claims as-

serted in the third-party litigation against Back Creek fall outside the coverage of the title insurance policies at issue and affirm.

## I. BACKGROUND

Back Creek is a real estate development company that purchased a piece of waterfront property in Annapolis in 1998. Back Creek developed a residential community called Harbor View on the property, complete with boat slips and water access. At the time of its purchase, Back Creek also bought a title insurance policy from First American Title Insurance Company ("First American") that insured its interest and estate in the land. The front page of the policy described the categories of "loss or damage" it covered:

FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation, herein called the Company, insures, as of the Date of Policy shown in Schedule A, *against loss or damage*, not exceeding the Amount of Insurance stated in Schedule A, *sustained or incurred by the Insured by reason of:*

1. Title to the estate or interest described in Schedule A being vested other than as stated herein;

2. Any defect in or lien or encumbrance on the title;

3. Unmarketability of the title;

4. Lack of a right of access to and from the land;

*The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured, but only to the extent provided in the Conditions and Stipulations.*[1]

(Emphasis added.)

In June 1999, in the course of developing Harbor View, Back Creek recorded a subdivision plat that divided the

---

1. The coverage is, as always, "SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS."

property into five single family lots and one larger lot designed for townhouses. Among other things, the plat depicted an easement going across four of the single family lots that gave each lot and townhouse resident walking access to his or her slip on the anticipated pier. In September 1999, Back Creek filed in the Anne Arundel County land records a Declaration of Easements, Covenants, and Restrictions ("Declaration") that defined the property rights and obligations of owners for the subdivision and created a community homeowners' association. The Declaration expressly reserved Back Creek's right to construct the pier, which Back Creek built before conveying any of the subdivided lots to purchasers. The Declaration also defined community property rights, including a Community Waterfront Access Easement for the residents and a conservation easement to the City of Annapolis.[2]

At some time around June 2000, Back Creek "procured a commitment from First American Title for an additional title policy . . . in order to protect and insure the value created by both the improvements made since its original 1998 purchase and the recorded Easement." Back Creek claims that this second commitment "committed for both a lender's policy and a Back Creek owner's policy" and "incorporated First American Title's standard title policy terms and conditions and listed the express exceptions to be contained in the policy." The commitment also, according to Back Creek, "did not describe any exceptions for either the Easement or the future Pier from coverage." There is no direct evidence that this commitment ever ripened into an actual second policy, but the parties and the circuit court assumed for purposes of summary judgment (and assume on appeal as well) that the second policy existed and that its terms and conditions "were identical and were comprised of the printed, boilerplate terms of the 1992 ALTA Owner's Policy Form."

---

2. The Declaration was ultimately amended twice in ways that don't bear on the issues before us.

Between 2000 and 2006, Back Creek conveyed the five residential lots to separate individual purchasers and conveyed the pier and boat slips to the community homeowners' association, subject to the Declaration. Back Creek conveyed Lot 4, the individual lot that is the subject of this case, in April 2001 to Nancy Hassett by way of a special warranty deed. She did not keep it for long: in August 2002, Ms. Hassett sold Lot 4 to Jeffrey C. Smith and Sandra Corry Smith ("the Smiths").

Notwithstanding the idyllic setting, life in Harbor View proved contentious and, ultimately, litigious. The Declaration's description of the Community Waterfront Access Easement proved ambiguous and impractical, and the neighbors (most notably the Smiths) began to dispute whether and where neighbors farther from the pier could walk to it. These disputes led to unsuccessful negotiations to establish a new path and, eventually, a lawsuit: on May 13, 2008, the Smiths filed a declaratory judgment suit in the Circuit Court for Anne Arundel County (the "Smith Action") against the community homeowners' association and Back Creek. The Smith Action complaint defies easy summarization, but all of its fifteen claims [3] relate to the assertion and definition of the Smiths' property rights vis-à-vis the other neighbors', specifically the scope of riparian rights of Lot 4, the pier and boat slips, and access to the pier and boat slips. Importantly, *none* of the Smith Action claims alleges any defect in the title Back Creek

---

3. The Smith Action alleged fifteen separate claims: (1) Quiet Title to Lot 4's Riparian Rights; (2) Declaration and Delineation of the Riparian Rights of Lot 4 and Declaration Concerning the Right to Wharf Out; (3) Action for Possession; (4) Slander of Title to Riparian Rights; (5) Injunction Against Unauthorized Activities in Plaintiffs' Riparian Zone; (6) Breach of Fiduciary Duty: Negligent or Malicious Failure to Pursue Second Connector; (7) Negligence by the Developer; (8) [Harbor View Homeowners Association] Derivative Claims against the Developer; (9) Tortious Interference with Contract for Second Connector; (10) Quiet Title to Boat Slip; (11) Slander of Title to Boat Slip; (12) Tortious Interference with Plaintiffs Tax Obligations; (13) Declaratory Judgment: Plaintiffs' Lot Not Subject to First or Second Amended Declaration of Easements, Covenants and Restriction; (14) Breach of Fiduciary Duty—Negligent Failure to Act Concerning Unapproved Structures; and (15) Conspiracy to Violate the Rights of and Disparage the Title of Plaintiffs.

passed to them (or any of the other owners), encumbrances, defects in the marketability of their title, or a lack of a right of access to and from the land.

After discovery, motions and an animated trial[4] that consumed all or part of twelve days, the court issued a detailed opinion. The court found that the Smiths' lot was subject to the initial Declaration but not subsequent versions, noted its earlier decision to dismiss all of the Smiths' other claims, defined the location of the easement, and enjoined the Smiths from interfering with their neighbors' use of the easement or pier. Back Creek successfully defended the claims lodged against it, but accumulated over $200,000 in attorneys' fees and expenses in the process.

After the Smith Action concluded, Back Creek sent a letter to First American asserting that the Smith Action claims fell within the scope of coverage of its title insurance policies and

---

**4.** The opening footnote of the circuit court's Opinion in the Smith Action describes the final crescendo of the trial:

The trial concluded precipitously on August 18, 2010, when Mr. Smith, as a witness, became angry at an objection from one of counter-plaintiffs' attorneys. Mr. Smith initially said "I am going to leave for the day . . . let's blow this clam bake!" The court advised both the Smiths "if you leave, we may close the trial unless you return to offer additional testimony or evidence." Mr. Smith angrily responded, "I am offering all my exhibit books. I will not legitimize the proceedings of a group of liars who have extorted the riparian rights and other things when I came up with a solution. I have motions on discovery that I go back to. I learned yesterday that everybody lies in circuit court. . . ." Mr. Smith proceeded to pack up all his exhibits, materials, and laptop, heading for the courtroom door, followed by Ms. Smith. The court again warned that, if the Smiths did not return after the (early) lunch break at 1:30 p.m. to continue presenting their case at 1:30, the court would consider the case to be closed and consider the Smiths to have rested their case, so the court might decide the case without any further evidence from them. Specifically asked by the court if she would return after the lunch break, Ms. Smith responded "I don't know." After this, both the Smiths left the courtroom and did not return after the lunch break.

Thus, in accordance with its final admonition to the Smiths, the court ruled that the Smiths had rested and that their case was closed, even though the counter-plaintiffs have not had the opportunity to complete a cross-examination of either Mr. Smith or Ms. Smith.

demanding reimbursement for Back Creek's attorneys' fees and litigation expenses. First American denied coverage, and Back Creek initiated this action in the Circuit Court for Montgomery County on December 2, 2011, alleging that First American breached the title insurance policies. First American responded to the complaint with a Motion for Summary Judgment that disputed coverage on three bases: (1) the policies had expired in 2006, when Back Creek finished divesting its interest in the development; (2) the claims against Back Creek in the Smith Action were not covered under the policies' terms; and (3) Back Creek had failed to give First American timely notice of the claims, and thus deprived First American of its rights to defend the case on Back Creek's behalf and to select defense counsel.

On April 16, 2012, after a hearing, the circuit court granted First American's motion for summary judgment. Back Creek filed a Motion for Clarification, and the circuit court entered an order on May 15, 2012, that clarified and reaffirmed summary judgment. Back Creek filed a timely notice of appeal.

## II. DISCUSSION

We review *de novo* questions of law decided on summary judgment. *Myers v. Kayhoe*, 391 Md. 188, 203, 892 A.2d 520 (2006). We must determine as well "whether a material factual issue exists, and in doing so, all factual inferences must be resolved against the moving party," *Cheverly Terrace P'ship v. Ticor Title Ins. Co.*, 100 Md.App. 606, 615–16, 642 A.2d 285 (1994) (citing *Rosenberg v. Helinski*, 328 Md. 664, 674, 616 A.2d 866 (1992)), in this case, First American.

Boiled to its essence,[5] this case turns on whether First American had a duty to defend Back Creek under these title

---

5. Back Creek articulated one Question Presented with three sub-parts:

1. Did the trial court err when it granted summary judgment in favor of First American Title and denied Back Creek coverage under its title insurance policies?

insurance policies, which in turn depends on whether the policies potentially covered the claims against Back Creek in the Smith Action. If the claims did potentially come within the policies' substantive coverage, First American's duty to defend normally would attach, although, under the unusual facts of this case, we would then need to determine whether Back Creek complied with the policies' notice requirements or whether Back Creek breached the policies by depriving First American of the rights to defend the case and select defense counsel.

 But we don't need to reach those questions here because the duty to defend never attached in the first place. Title insurance in general is meant to protect title to property as it existed at a particular time; these title policies in particular covered claims relating to the title that Back Creek obtained when it bought the property and the titles it passed to the Harbor View neighbors. The Smith Action involved no such claims. Instead, the claims in the Smith Action involved disputes regarding the location of the Community Water Access Easement, the neighbors' respective access to that easement and dock, and the scope of the Smiths' riparian rights. Nobody alleged, and the court in the Smith Action never addressed, any defect in Back Creek's title or the titles it conveyed to the Harbor View residents, nor any liens or encumbrances that hadn't been disclosed. As we explain below, we agree with the circuit court that the claims against Back Creek in the Smith Action were not and could not be

---

a. Did the circuit court err by granting summary judgment on the grounds of untimely notice by Back Creek despite the failure of First American Title to offer evidence of any actual prejudice as required by Md.Code Ann., Ins., § 19–110 and controlling case law?

b. Did the circuit court err by granting summary judgment on the grounds that matters arising during the contract term of the title policies were not covered occurrences because the claims were only asserted after the termination of the policies?

c. Did the circuit court err by granting summary judgment on the grounds that there was no potentiality of coverage for claims challenging Back Creek's riparian property rights and alleging a defect in its pre-existing beneficial easement of record?

covered by the policies, and we affirm its decision to grant summary judgment in favor of First American.

 Title insurance protects property holders against loss or damage resulting from defects or unmarketability in the title of the property held by the insured. *Stewart Title Guar. Co. v. West,* 110 Md.App. 114, 128, 676 A.2d 953 (1996). Title insurance can also serve as "litigation insurance," *id.* (citing D. Barlow Burke, Jr., Real Estate Transactions: Examples and Explanations 185 (1993)), to the extent that the policy requires the insurer to defend the policy holder from attacks by third parties against the insured title. *Id.* An insurer's duty to defend is broader than its duty to indemnify. *Walk v. Hartford Cas. Ins. Co.,* 382 Md. 1, 15, 852 A.2d 98 (2004); *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 408, 347 A.2d 842 (1975). But the duty to defend is not limitless: a title insurer's duty to defend depends on (1) the scope of the policy's coverage and (2) whether the allegations in the underlying suit bring the claim within this coverage. *Cheverly Terrace,* 100 Md.App. at 610, 642 A.2d 285 (citing *St. Paul Fire & Marine Ins. Co. v. Pryseski,* 292 Md. 187, 193, 438 A.2d 282 (1981)); *see also Lawyers Title Ins. Corp. v. Knopf,* 109 Md.App. 134, 144, 674 A.2d 65 (1996).

To determine whether First American had a duty to defend Back Creek in the Smith Action, we must examine (a) the scope of coverage of the title insurance policies, and (b) whether the Smith Action claims against Back Creek fell within this scope of coverage. As always, we start with the policies, specifically "the terms of the insurance policy, ... accord[ing] the terms their 'customary, ordinary, and accepted meaning.'" *Knopf,* 109 Md.App. at 148, 674 A.2d 65 (quoting *Chantel Assocs. v. Mt. Vernon Fire. Ins. Co.,* 338 Md. 131, 142, 656 A.2d 779 (1995)). We assume, as the parties and the circuit court did, that the second title policy exists and contains the same terms and conditions as the first.

 The insuring language in the policies provides that First American "insures, as of [the] Date of Policy ..., against

loss or damage ... sustained or incurred by the insured by reason of" four categories of claims:

1. *Title to the estate or interest* described in [the policy] being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the *title;*
3. Unmarketability of the *title;* [and]
4. Lack of a *right of access* to and from the land[.]

(Emphasis added.) According to the "Conditions and Stipulations," coverage continues so "long as the insured retains an estate or interest in the land ... or [ ] so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest." The operative language is consistent with the title (as it were) of the policies themselves: they cover claims relating to the insured's title or access to the designated property, and they provide coverage during the time when the insured holds title to the property or owes a warranty of title to a subsequent purchaser. Once the insured no longer holds title to the property, or no longer owes anyone else a warranty of title, coverage terminates—at that point, the insured's successor-in-interest either will have assumed or insured the risk of defects in the title it took.[6] *See, e.g., Gebhardt Family Inv., LLC v. Nations Title Ins. of N.Y., Inc.,* 132 Md.App. 457, 464–66, 752 A.2d 1222 (2000); *Chi. Title Ins. Co. v. 100 Inv. Ltd. P'ship,* 355 F.3d 759, 763–64 (4th Cir.2004).

Out of the box, then, Back Creek runs into what would seem to be an insurmountable problem: the Smith Action was initiated in 2008, two years *after* Back Creek conveyed its last interest in any lot of the insured property. In *Gebhardt,* we affirmed summary judgment in favor of an insurer and held that the insured's transfer of property from the insured family members to an LLC owned and controlled entirely by the

---

**6.** And in that regard, title insurance is categorically different than liability policies, which define coverage temporally, either in terms of when the event giving rise to the claim took place ("occurrence" policies) or when the insured first learned of the claim ("claims-made" policies).

same people transferred the title defect and terminated the policy:

> The problem of the cloud on title is now the problem of the [transferee] and not the [insured transferor]. *If any loss is suffered because of the cloud on title,* it will be suffered by the [transferee], which was not an insured under the policy either before or after the conveyance.

132 Md.App. at 466, 752 A.2d 1222 (emphasis added).[7] If the Smith Action had alleged claims relating to defects in the title Back Creek conveyed to its buyers, those defects passed to Back Creek's successors-in-interest at the time of conveyance and would not be covered.[8]

 Timing aside, though, we agree with the circuit court that First American had no duty to defend Back Creek against the Smith Action claims. We recognize that the "facts ultimately proven in the . . . underlying suit" have no bearing on First American's duty to defend under the title insurance policies. *Cheverly Terrace,* 100 Md.App. at 612, 642 A.2d 285. "Rather, an insurer's duty to defend is based on whether the allegations in the complaint potentially bring the claim within the policy's coverage . . . [,] even where the action against the insured is frivolous." *Id.* at 612–13, 642 A.2d 285. And we recognize as well that Back Creek only would need to demon-

---

7. *100 Investment,* 355 F.3d 759, does not help Back Creek either. In that case, the Fourth Circuit, interpreting Maryland law, identified the terms of the title insurance policy as providing for a duty to defend when the "loss or damage alleged in the [ ] litigation [against the insured] occurred [within the coverage] period." 355 F.3d at 766. But the only claim as to which the court found a duty to defend in that case was a claim for trespass during the time the insured owned the property, which the court found to involve a "loss or damage" occurring within the policy period. *Id.* at 766–67. In contrast, the court rejected, as we did in (and citing) *Gebhardt,* the insured's demand for coverage of costs incurred after conveying the property to clear a defect in the title of the property itself. *Id.* at 763–65.

8. In this case, any such claims would be another step further removed, since the Smiths bought Lot 4 from an intervening purchaser. Back Creek did sell Lot 4 to Ms. Hassett subject to a warranty deed, but there is no allegation that the Smith Action claims invoked or sought to invoke that warranty (which would not extend to the Smiths anyhow).

strate that one of the Smiths' claims is potentially covered by the title insurance policies. If any claim raised by the insured potentially falls within the scope of policy coverage, the insurer must defend against all claims raised by the insured. *Utica Mut. Ins. Co. v. Miller,* 130 Md.App. 373, 383, 746 A.2d 935 (2000).

Nevertheless, a careful review of the Smith Action claims reveals that Back Creek fails to clear even this relatively low bar. Although perhaps difficult to summarize concisely, the Smith Action claims all relate to the rights of access established by the subdivision covenants and related documents filed by Back Creek *after* it had acquired the parcel that eventually became Harbor View. *None* of the Smith Action claims relates one whit to any other alleged defect in the title they (or any of the other neighbors) took from Back Creek, to liens or encumbrances, or to their respective rights of access: the complaint seeks to define and take title to riparian rights associated with Lot 4 (Counts 1–3); seeks to redress alleged trespasses or interference with Lot 4's riparian rights (Counts 4–5); alleges that Back Creek was negligent or breached duties in the way it defined the property rights contained in and constructed the Community Water Access Easement (Counts 6–9); seeks to assert property rights relating to a boat slip (Counts 10–11); seeks to redress allegedly improper tax treatment for the property (Count 12); seeks to avoid the application of the amended Declarations (Count 13); complains about unapproved structures (Count 14); and alleges a conspiracy to deprive the Smiths of the property rights they claimed to hold (Count 15). These claims could not possibly have been covered under these title policies, as a matter of logic, plain language, and law, and the circuit court correctly held as much. And in fact, the Smiths could not have asserted these during the time that Back Creek held title to the property—the Smiths could only assert a claim of superior title in the land (or water rights) *after* they purchased it from Ms. Hassett.

Because these title insurance policies could not possibly have covered the Smith Action claims against Back Creek, the

circuit court correctly held that First American had no duty to defend Back Creek, and thus no obligation to pay Back Creek's attorneys' fees and defense costs. Summary judgment in favor of First American is affirmed; we need not, and do not, reach First American's other coverage defenses.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**